*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

SUMMER SAGOONICK; LINNEA L., a )
minor, by and through her guardian, ) Supreme Court No. S-17297
HANK LENTFER; TASHA ELIZARDE; )
CADE TERADA; KAYTLYN KELLY; ) Superior Court No. 3AN-17-09910 CI
BRIAN CONWELL; JODE SPARKS; )
MARGARET "SEB" KURKLAND; ) O P I N I O N
LEXINE D., a minor, by and through her )
guardian, BERNADETTE ) No. 7583 – January 28, 2022
DEMIENTIEFF; ELIZABETH )
BESSENYEY; VANESSA DUHRSEN; )
ANANDA ROSE AHTAHKEE L., a )
minor, by and through her guardian, )
GLEN "DUNE" LANKARD; GRIFFIN )
PLUSH; CECILY S. and LILA S., minors, )
by and through their guardians, )
MIRANDA WEISS and BOB )
SHAVELSON; and ESAU SINNOK, )
)
                    Appellants, )
)
        v. )
)
STATE OF ALASKA; OFFICE OF )
GOVERNOR and GOVERNOR MIKE )
DUNLEAVY, in an official capacity; )
DEPARTMENT OF ENVIRONMENTAL )
CONSERVATION and )
COMMISSIONER JASON BRUNE, in an )
official capacity; DEPARTMENT OF )
NATURAL RESOURCES; ALASKA )
OIL & GAS CONSERVATION )
COMMISSION; ALASKA ENERGY )
)

AUTHORITY; and REGULATORY )
COMMISSION OF ALASKA, )
)
           Appellees. )
)

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Brad D. De Noble, De Noble Law Offices LLC, Eagle River, and Andrew L. Welle, Eugene, Oregon, for Appellants. Anna R. Jay and Laura E. Wolff, Assistant Attorneys General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellees. Elizaveta Barrett Ristroph, Fairbanks, for Amicus Curiae League of Women Voters Alaska. Teresa B. Clemmer, Peter Van Tuyn, and Jen Marlow, Bessenyey & Van Tuyn LLC, Anchorage, for Amici Curiae Law Professors. Robert John, Law Office of Robert John, Fairbanks, for Amici Curiae Alaska Inter-Tribal Council, Eyak Preservation Council, and Native Conservancy Land Trust.[*]

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

WINFREE, Justice.
MAASSEN and CARNEY, Justices, dissenting in part.

## I. INTRODUCTION

Alaska Constitutional Convention keynote speaker E.L. "Bob" Bartlett, territorial Alaska's delegate to Congress and later one of Alaska's original United States Senators, spoke on November 8, 1955 about the importance of Alaska's natural resources for future generations: "[F]ifty years from now, the people of Alaska may very

---

    [*]      We thank amici curiae for their participation in this appeal.

well judge . . . this Convention not by the decisions taken upon issues like local government, apportionment, and the structure and powers of the three branches of government, but rather by the decision taken upon the vital issue of resources policy."[1] Bartlett particularly stressed the need to protect Alaska's natural resources from the "robber baron philosophy" that in the past had damaged the territory.[2] And a convention consultant later noted: "[W]hat we say about natural resources is not limited simply to lands and to fish . . . , but rather being concerned with how we as human beings are going to utilize those so that they become a part of the continuing future development of an area like Alaska."[3]

More than six decades after Alaska's constitution was drafted, we consider its natural resources provisions in a manner likely not contemplated by Bartlett or the convention delegates. Concerns about protecting and developing natural resources for the State's financial support now co-exist with concerns that constitutionally driven resource development creates an existential threat to human life and therefore itself violates individuals' fundamental rights under Alaska's constitution.

A number of young Alaskans — including several Alaska Natives — sued the State, alleging that its resource development is contributing to climate change and

---

[1] 6 Proceedings of the Alaska Constitutional Convention (PACC) App. II at 3 (Nov. 8, 1955) (address of Cong. Del. E.L. Bartlett); *see also* VICTOR FISCHER, ALASKA'S CONSTITUTIONAL CONVENTION 130 (1975).

[2] FISCHER, *supra* note 1, at 130; *see also Mallot v. Stand for Salmon*, 431 P.3d 159, 164 (Alaska 2018) ("For more than two centuries, Alaska's economy has been centered around the development and harnessing of its natural resources, from the fur trade of the 18th and 19th Centuries and the gold rushes of the 1890s, to the growth of copper mining and commercial fishing in the early 20th Century and the oil discoveries of the 1950s and 1960s.").

[3] 1 PACC 475 (Dec. 1, 1955) (statement of Vincent Ostrom).

adversely affecting their lives. They sought declaratory and injunctive relief based on allegations that the State has, through existing policies and past actions, violated both the constitutional natural resources provisions and their individual constitutional rights. The superior court dismissed the lawsuit, concluding that the injunctive relief claims presented non-justiciable political questions better left to the other branches of government and that the declaratory relief claims should, as a matter of judicial prudence, be left for actual controversies arising from specific actions by Alaska's legislative and executive branches. The young Alaskans appeal, raising compelling concerns about climate change, resource development, and Alaska's future. But we conclude that the superior court correctly dismissed their lawsuit.

## II.    SEPARATION OF POWERS IN ALASKA'S NATURAL RESOURCES MANAGEMENT

### A.    Constitutional Natural Resource Policy And Framework — Article VIII

It was widely recognized that the Alaska Territory's future success as a state would depend upon natural resource development.[4] Statehood bills pending during the Constitutional Convention contemplated transferring to the proposed state substantial federal land, subsurface mineral rights, and the authority to manage fish and wildlife.[5]

---

[4]    GORDON HARRISON, ALASKA LEGISLATIVE AFFAIRS AGENCY, ALASKA'S CONSTITUTION: A CITIZEN'S GUIDE 129-30 (5th ed. 2021), available at: http://akleg.gov/docs/pdf/citizens_guide.pdf; *see also* PUBLIC ADMINISTRATION SERVICE, THE ALASKAN CONSTITUTION AND THE STATE PATRIMONY: THE CONSTITUTION AND NATURAL RESOURCES 14 (1955) (stating, in report to convention delegates, that "[f]ew will quarrel with the statement that Alaska's greatest single source of potential wealth lies below the surface of the land").

[5]    FISCHER, *supra* note 1, at 129-30 ("According to the terms of pending Alaska statehood bills, more than 100 million acres would be transferred from federal to state ownership."); HARRISON, *supra* note 4, at 129; *cf.* Alaska Statehood Act, Pub.

<span style="text-align:right">(continued...)</span>

The convention delegates "sought to enshrine in the state constitution the principle that the resources of Alaska must be managed for the long-run benefit of the people as a whole."[6] Rather than developing a detailed constitutional code governing resource management,[7] the delegates sought to protect the long-term viability of Alaska's natural resources from "the indifference or avarice of future generations" by fixing "the general concept of the public interest" in both Alaska law and "the consciousness of Alaskans."[8] The delegates incorporated concepts such as "common use"[9] and "sustained yield"[10] to

[5]      (...continued)
L. No. 85-508, § 6, 72 Stat. 339, 340-41 (1958) (allowing Alaska to select over 100 million acres of federal public lands and contemplating eventual transfer to Alaska of authority to manage fish and wildlife); Alaska Land Transfer Acceleration Act, Pub. L. No. 108-452, 118 Stat. 3575 (2004) (facilitating transfer to Alaska of some federal lands selected pursuant to Alaska Statehood Act).

[6]      HARRISON, *supra* note 4, at 129. *But see* William L. Iġġiaġruk Hensley & John Sky Starkey, *Alaska Native Perspectives on the Alaska Constitution*, 35:2 ALASKA L. REV. 129-37 (2018) (asserting connection between insufficient representation of Alaska Natives at Constitutional Convention and insufficient protections for Alaska Native rights under article VIII).

[7]      *See Native Vill. of Elim v. State*, 990 P.2d 1, 7 (Alaska 1999) ("The plain language of [article VIII, section 4] requires resource managers to apply . . . principles; it does not mandate the use of a predetermined formula, quantitative or qualitative.").

[8]      HARRISON, *supra* note 4, at 129; *see West v. State, Bd. of Game*, 248 P.3d 689, 696 (Alaska 2010) ("The [natural resources] article's primary purpose is to balance maximum use of natural resources with their continued availability to future generations." (alteration in original) (quoting THE ALASKA CONSTITUTIONAL CONVENTION, PROPOSED CONSTITUTION FOR THE STATE OF ALASKA: A REPORT TO THE PEOPLE OF ALASKA (1956))).

[9]      Alaska Const. art. VIII, § 3 ("Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use."); *see Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 493 (Alaska 1988) ("[The common use
(continued...)

promote "a harmonious balance between consumption, preservation, and expansion of natural resources."[11] They further protected the public interest by requiring public notice and development of statutory guidelines for state property disposals.[12]

Article VIII, sections 1 and 2 of the Alaska Constitution express Alaska's resource development policy and direct the legislature to implement it:

---

[9] (...continued) clause] was a unique provision, not modeled on any other state constitution. Its purpose was anti-monopoly. This purpose was achieved by constitutionalizing common law principles imposing upon the state a public trust duty with regard to the management of fish, wildlife[,] and waters.").

[10] Alaska Const. art. VIII, § 4 ("Fish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses."). The glossary definition of "sustained yield" provided by the Constitutional Convention's Resources Committee is: "[T]he term 'sustained yield principle' . . . . denotes conscious application insofar as practicable of principles of management intended to sustain the yield of the resource being managed." RESOURCES COMMITTEE OF THE ALASKA CONSTITUTIONAL CONVENTION, Terms (1955), http://www.akleg.gov/pdf/billfiles/ConstitutionalConvention/Folder%20210.pdf; *see West*, 248 P.3d at 695-96 (discussing broad meaning of "sustained yield" in wildlife context); *see also* AS 38.04.910(12) (defining "sustained yield" in public lands context as "the achievement and maintenance in perpetuity of a high level annual or regular periodic output of the various renewable resources of the state land consistent with multiple use").

[11] FISCHER, *supra* note 1, at 130; *see also* GERALD A. MCBEATH, THE ALASKA STATE CONSTITUTION 157-59 (2011); HARRISON, *supra* note 4, at 130.

[12] Alaska Const. art. VIII, § 10 ("No disposals or leases of state lands . . . shall be made without prior public notice and other safeguards of the public interest . . . ."); *id.* at §§ 9-10 (authorizing legislature to regulate state land disposals); *see* HARRISON, *supra* note 4, at 130 ("With certain exceptions, [article VIII] allows the government to sell, lease or give away public land and resources, but it may do so only in accordance with constitutional and statutory guidelines, and all transactions must be in full public view.").

Section 1.  Statement of Policy.  It is the policy of the State to encourage the settlement of its land and the development of its resources by making them available for maximum use consistent with the public interest.[13]

Section 2.  General Authority.  The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people.[14]

---

[13] *See* HARRISON, *supra* note 4, at 131 ("This is an emphatic statement that the policy of the state is to encourage the development of its land and resources, but in a manner that recognizes the collective interests of the people as the owners of these lands and resources."); *see also* MCBEATH, *supra* note 11, at 159 ("Delegates to the constitutional convention were uniform in their belief that Alaska's natural resources had been 'locked up' and devalued by the negligent actions of the federal government and absentee owners . . . . Thus, the delegates were committed to the maximum development of Alaska's resources.  However, they hedged their need to exploit resources with the requirement that resource use was a public trust.").

[14] *See* HARRISON, *supra* note 4, at 131 ("This section is a broad grant of legislative authority to implement the policy enunciated in Section 1 . . . . In addition to utilization and development, conservation appears as an objective of resource management.  The delegates understood the term in its traditional sense of 'wise use.' "); MCBEATH, *supra* note 11, at 159 (stating that delegates "were influenced by the modern principles of resource conservation and use, such as sustained yield and multiple use, which they made the constitutional objectives for all resource policy decisions, as expressed in the phrase, 'maximum use consistent with the public interest' " (quoting Alaska Const. art. VIII, §1)); *see also Kenai Peninsula Fisherman's Coop. Ass'n v. State*, 628 P.2d 897, 903 (Alaska 1981) ("The terms 'conserving' and 'developing' both embody concepts of utilization of resources.  'Conserving' implies controlled utilization of a resource to prevent its exploitation, destruction or neglect.  'Developing' connotes management of a resource to make it available for use.").

Beyond those sections, article VIII explicitly addresses "common use"[15] and "sustained yield";[16] the "public domain" available for settlement and certain property uses;[17] disposition of property interests;[18] mineral rights;[19] water rights;[20] fishing rights;[21]

---

[15]     *See* Alaska Const. art. VIII, § 3.

[16]     *See id.* § 4.

[17]     *See id.* §§ 5-7; *State, Dep't of Nat. Res. v. Alaska Riverways, Inc.*, 232 P.3d 1203, 1212-14 (Alaska 2010) (discussing article VIII, section 6 and "public domain").

[18]     Alaska Const. art. VIII, § 8 (regarding leasing), § 9 (regarding sales and grants), § 10 (regarding public notice).

[19]     *Id.* § 11 (regarding mineral rights), § 12 (regarding mineral leases).

[20]     *Id.* § 13 (regarding water rights), § 14 (regarding access to navigable waters); *see Tulkisarmute Native Cmty. Council v. Heinze*, 898 P.2d 935, 940-41 (Alaska 1995) (acknowledging article VIII, section 13 constitutionalizes water appropriation doctrine).

[21]     Alaska Const. art. VIII, § 15 ("No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State. This section does not restrict the power of the State to limit entry into any fishery for purposes of resource conservation, to prevent economic distress among fisherman and those dependent upon them for a livelihood and to promote the efficient development of aquaculture in the State."); *see McDowell v. State*, 785 P.2d 1, 5-10 (Alaska 1989) ("[S]ection 15 . . . was meant to ensure an equal right to participate in fisheries, regardless of where one resides."); *Kenai Peninsula Fisherman's Coop. Ass'n v. State*, 628 P.2d 897, 903-04 (Alaska 1981) (interpreting article VIII, section 15).

private property rights;[22] equal treatment with respect to the use of natural resources;[23] and the right of eminent domain for the access, extraction, and use of natural resources.[24]

Article VIII was, when approved, the most comprehensive state constitution provision addressing natural resource management policies and principles,[25] and it reflects careful consideration of each government branch's role in managing Alaska's

---

[22]      Alaska Const. art. VIII, § 16 ("No person shall be involuntarily divested of his right to the use of waters, his interests in lands, or improvements affecting either, except for a superior beneficial use or public purpose and then only with just compensation and by operation of law."); *see Alaska Riverways, Inc.*, 232 P.3d at 1213-14 (interpreting article VIII, section 16 as applied to shoreland improvements made after statehood).

[23]      Alaska Const. art. VIII, § 17 ("Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation."); *see McDowell*, 785 P.2d at 9-11 ("[A]ny system which closes participation to some, but not all, [fish and game permit] applicants will necessarily create a tension with article VIII[, section 17]."); *Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 498 n.17 (Alaska 1988) ("[W]e [have] noted that [article VIII, section 17] may require 'more stringent review' of a statute than does the equal protection clause in cases involving natural resources." (quoting *Gilman v. Martin*, 662 P.2d 120, 126 (Alaska 1983))).

[24]      Alaska Const. art. VIII, § 18 (regarding eminent domain for private ways of necessity to obtain access to natural resources).

[25]      *See* HARRISON, *supra* note 4, at 129 ("In drafting [article VIII], delegates were unable to refer to other state constitutions or the Model State Constitution for ideas and guidance, as none of them dealt with natural resource policy as broadly as the Alaskans thought necessary. At the time of Alaska's constitutional convention, only the Hawaii Constitution addressed natural resource policy in a separate article, and that article was brief." (emphasis omitted)). *But cf.* William L. Iġġiaġruk Hensley & John Sky Starkey, *Alaska Native Perspectives on the Alaska Constitution*, 35:2 ALASKA L. REV. 129-37 (2018) (asserting connection between insufficient representation of Alaska Natives at Constitutional Convention and insufficient protections for Alaska Native rights under article VIII).

resources and textually establishes the legislature's importance in this policy-making area. We consider the legislature's ensuing statutory policies and the young Alaskans' claims in light of this constitutional framework.

**B.      The Political Branches' Roles Under Article VIII**

Article VIII, section 2, commands the legislature "to provide for the utilization, development, and conservation of all natural resources belonging to the State." To satisfy this obligation the legislature has established numerous interrelated statutory policies and delegated implementation authority to the executive branch. We briefly describe the legislature's policies, starting with land use policies, continuing with specific relevant policies, and concluding with an environmental protection policy.

**1.      General land use and management policies**

Title 38 of the Alaska Statutes contains the legislature's general public land enactments. The legislature's overall land management policy mirrors article VIII, section 1: "It is the policy of the state to encourage the settlement of its land and the development of its resources by making them available for the maximum use consistent with the public interest."[26] On a more detailed level the legislature has directed that state lands be managed to balance both public and private purposes and that land use choice

---

[26]      AS 38.05.910; *see Alaska Survival v. State, Dep't of Nat. Res.*, 723 P.2d 1281, 1285 (Alaska 1986) ("Alaska's Constitution and the Alaska Land Act, AS 38.05, express a policy of encouraging settlement of the state's lands 'by making them available for maximum use consistent with the public interest.' " (quoting Alaska Const. art. VIII, § 1; AS 38.05.910)), *superseded on other grounds by statute*, ch. 75, § 10, SLA 1987, *as recognized in Sullivan v. Resisting Env't Destruction on Indigenous Lands* (*REDOIL*), 311 P.3d 625, 630 (Alaska 2013).

be determined through inventory, planning, and classification processes established in AS 38.04.060-.070.[27]

The legislature has delegated to the Department of Natural Resources (DNR), an executive branch agency, the duty to implement the legislature's general public lands policies.[28] DNR classifies, and if necessary reclassifies, state lands for various uses.[29] DNR also has a duty to work with local governments and the public to adopt, maintain, and revise regional land use plans.[30]

The legislature has further delegated to DNR authority to manage "exploration, development, and mining" of resources on state lands[31] and the authority

---

[27] AS 38.04.005-.015 (stating general land classification and use policy, public interest in making land available for private use, and public interest in retaining state land in public ownership).

[28] AS 38.04.060(a)-(b) (outlining commissioner's duties); AS 38.04.910(1) (identifying "commissioner" as commissioner of natural resources).

[29] AS 38.04.065(e); AS 38.05.300; *see also State v. Wiedner*, 684 P.2d 103, 107 (Alaska 1984) (stating that AS 38.04.065 generally requires land use plans prior to land classifications); *cf.* AS 38.05.300(a), (c) (establishing DNR's discretion for classification but restricting discretion to close large parcels of land to multiple-purpose use and to preclude mineral exploration and mining unless necessary for land disposal or certain projects). We previously have discussed Alaska's land use management procedures in more detail. *See generally State, Dep't of Nat. Res. v. Nondalton Tribal Council*, 268 P.3d 293, 294-96 (Alaska 2012); *Alaska Survival*, 723 P.2d at 1289-91.

[30] AS 38.04.065(a), (d), (e); *see also Denali Citizens Council v. State, Dep't of Nat. Res.*, 318 P.3d 380, 389 (Alaska 2014) (noting statutory duty to engage in regional land use planning does not indicate plan provisions are legally enforceable against DNR); *Nondalton Tribal Council*, 268 P.3d at 304 n.93 (stating that although regional land use plan informs future DNR policy, it likely is not enforceable by public against DNR).

[31] AS 27.05.010; AS 38.05.005-.020, .035, .135-.177.

to lease state lands for oil and gas exploration.[32] But the legislature has delegated to the Alaska Oil and Gas Conservation Commission, a different executive branch agency, the authority to regulate oil and gas development for conservation purposes.[33]

### 2. Specific development policies

The legislature has enacted other statutory policies addressing fundamental aspects of Alaska's natural resources management. The legislature's long-standing economic development policy is found in AS 44.99.100(a):[34]

> To further the goals of a sound economy, stable employment, and a desirable quality of life, the legislature declares that the state has a commitment to foster the economy of Alaska through purposeful development of the state's abundant natural resources and productive capacity. It is the legislature's intent that this development
>
> (1) offer long-term benefits and increased employment to Alaskans by strengthening and diversifying the state's economic base and encouraging new activities;
>
> (2) provide opportunities for increased personal income or reduced living costs by creating activity in economic sectors;
>
> (3) have a positive effect on the revenue needs and fiscal conditions of the state and local communities; [and]
>
> (4) be undertaken after consideration of the social and economic views of citizens impacted by the

---

[32] AS 38.05.010, .131-.134, .180.

[33] AS 31.05.005-.170; *Alaskan Crude Corp. v. State, Dep't of Nat. Res., Div. of Oil & Gas*, 261 P.3d 412, 414 n.3 (Alaska 2011) (describing commission as independent quasi-judicial agency with authority over all state-regulated land to regulate to prevent waste, ensure greater recovery, protect correlative rights and underground water, and further public health and safety).

[34] Ch. 63, § 1, SLA 1985.

development, and only after adequate protection is assured for Alaska's environment.

The legislature has made a related finding that Alaskans have an interest in oil and gas development to "maximize the economic . . . recovery of those resources" and that it is in the State's best interests to encourage oil and gas resource assessments allowing flexibility in leasing and minimizing the adverse impact of exploration, development, production, and transportation activity.[35]

The legislature's more recent Arctic policy focuses on economic and natural resource development above the Arctic Circle, along with related environmental concerns, and is found in AS 44.99.105(a):[36]

> It is the policy of the state, as it relates to the Arctic, to . . . uphold the state's commitment to economically vibrant communities sustained by development activities consistent with the state's responsibility for a healthy environment, including efforts to . . . ensure that Arctic residents and communities benefit from economic and resource development activities in the region; . . . sustain current, and develop new, approaches for responding to a changing climate, and adapt to the challenges of coastal erosion, permafrost melt, and ocean acidification; . . . collaborate with all levels of government, tribes, industry, and nongovernmental organizations to achieve transparent and inclusive Arctic decision-making, including efforts to . . . value and strengthen the resilience of communities and respect and integrate the culture, language, and knowledge of Arctic peoples[;] . . . recognize Arctic indigenous peoples' cultures and unique relationship to the environment, including traditional reliance on a subsistence way of life for food security, which provides a spiritual connection to the

---

[35] AS 38.05.180(a) (concerning leasing state lands for oil and gas development).

[36] Ch. 10, § 2, SLA 2015.

land and the sea; . . . [and] safeguard the fish, wildlife, and environment of the Arctic for the benefit of residents of the state; . . . .

The legislature's stated (but uncodified) intent underlying the Arctic policy included recognition that although climate change presents risks, continuing resource development in an environmentally and socially responsible manner is essential to Alaska's economy and residents.[37]

The legislature's long-standing mineral policy is found in AS 44.99.110:[38]

The legislature, acting under art. VIII, sec. 1 of the Constitution of the State of Alaska, in an effort to further the economic development of the state, to maintain a sound economy and stable employment, and to encourage responsible economic development within the state for the benefit of present and future generations through the proper conservation and development of the abundant mineral resources . . . , including metals, industrial minerals, and coal, declares as the mineral policy of the state that

(1) mineral exploration and development be given fair and equitable consideration with other resource uses in the multiple use management of state land; . . . .

The legislature's relatively recent energy policy is found in AS 44.99.115:[39]

The State of Alaska recognizes that the state's economic prosperity is dependent on . . . energy to supply the state's . . . needs. The state also recognizes that worldwide supply and demand for fossil fuels and concerns about global

---

[37]     *Id.* § 1 ("[C]ontinuing development of the state's natural resources in an environmentally and socially responsible manner is essential to the development of the state's economy and to the well-being of the residents of the state . . . .").

[38]     Ch. 138, § 1, SLA 1988.

[39]     Ch. 82, § 2, SLA 2010.

climate change will affect the price of fossil fuels . . . . [I]t is the policy of the state to . . . . encourage economic development by . . . promoting the development of renewable [energy sources] . . . . [and] promoting the development, transport, and efficient use of nonrenewable and alternative energy resources, including natural gas, coal, oil, gas hydrates, heavy oil, and nuclear energy for use by Alaskans and for export . . . .

The legislature's stated (but uncodified) intent underlying the energy policy focused on energy efficiency, calling for a 15% increase in energy efficiency between 2010 and 2020 and for 50% of electricity generation through renewable resources by 2025, while emphasizing "remain[ing] a leader in petroleum and natural gas production and becom[ing] a leader in renewable and alternative energy development."[40]

### 3. Environmental protection and public trust policy

The legislature's long-standing environmental protection and public trust policy is found in AS 46.03.010:[41]

(a) It is the policy of the state to conserve, improve, and protect its natural resources and environment and control water, land, and air pollution, in order to enhance the health, safety, and welfare of the people of the state and their overall economic and social well-being.

(b) It is the policy of the state to . . . develop and manage the basic resources of water, land, and air to the end

---

[40]    *Id.* § 1.

[41]    Ch. 120, § 3, SLA 1971.  This policy is part of legislation creating the Alaska Department of Environmental Conservation and granting authority to regulate pollution.  *Id.* § 1-3.

that the state may fulfill its responsibility as trustee of the environment for the present and future generations.[42]

## C.    The Judiciary's Role Under Article VIII

Article VIII effectively limits the judiciary's role in implementing Alaska's natural resources policies. In *Sullivan v. REDOIL* we quoted article VIII, sections 1 and 2, and then stated that it is the legislature's "duty to determine the procedures necessary for ensuring . . . the State's resources are used 'for the maximum benefit of its people.' "[43] We clarified that we do not "provide instruction on *how* the State should determine what action would be for the maximum benefit of the Alaskan people."[44] We said our role instead is ensuring that constitutional principles are followed, particularly the mandate that "natural resources are to be made 'available for maximum use

---

[42]    Article VIII of the Alaska Constitution also gives rise to some public trust obligations. *See Brooks v. Wright*, 971 P.2d 1025, 1031 (Alaska 1999) ("Instead of recognizing the creation of a public trust in [individual article VIII] clauses per se, we have noted that 'the common use clause was intended to engraft in our constitution certain trust principles . . . .' " (quoting *Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 496 (Alaska 1988))). Alaska's constitutional public trust principles have been discussed and applied in various contexts, including: subsistence hunting regulations, *McDowell v. State*, 785 P.2d 1, 16-19 (Alaska 1989) (Rabinowitz, J., dissenting); hunting licensing, *Owsichek*, 763 P.2d at 494-97; fishing regulations, *Tongass Sport Fishing Ass'n v. State*, 866 P.2d 1314, 1317-18 (Alaska 1994); riparian land ownership, *State, Dep't of Nat. Res. v. Alaska Riverways, Inc.*, 232 P.3d 1203, 1211-12 (Alaska 2010); and wildlife management, *Brooks*, 971 P.2d at 1030-33. We previously have contemplated the possibility that the State's constitutional public trust obligations may be implicated by harm to the atmosphere insofar as it is "inextricably linked" to "recognized public trust resources such as water, shorelines, wildlife, and fish." *Kanuk ex rel. Kanuk v. State, Dep't of Nat. Res.*, 335 P.3d 1088, 1103 (Alaska 2014).

[43]    311 P.3d. 625, 634-35 (Alaska 2013) (quoting Alaska Const. art. VIII, § 2).

[44]    *Id.* at 635 (emphasis in original).

consistent with the public interest.' "[45] When an executive agency decision about natural resources is challenged under article VIII, our role thus is limited to ensuring that the agency has "taken a 'hard look' at all factors material and relevant to the public interest."[46]

> As we explained in *Sullivan*:
>
> The "hard look" doctrine for reviewing DNR's decisions first appeared in *Hammond v. North Slope Borough*, when we referenced a United States Supreme Court statement that the "court cannot substitute its judgment as to environmental consequences, but should only ensure that the agency has taken a 'hard look.' " A year later, in *Southeast Alaska Conservation Council, Inc. v. State*, we stated that our role is to
>
>> ensure that the agency "has given reasoned discretion to all the material facts and issues." The court exercises this aspect of its supervisory role with particular vigilance if it "becomes aware, especially from a combination of danger signals, that the agency has not really taken a '*hard look*' at the salient problems and has not genuinely engaged in reasoned decision making."
>
> Since then, we have used the "hard look" standard when reviewing agency decisions on resource uses.[47]

---

**45**      *Id.*

**46**      *Id.* (quoting *Kachemak Bay Conservation Soc'y v. State, Dep't of Nat. Res.*, 6 P.3d 270, 294 (Alaska 2000)).

**47**      *Id.* at 635 n.46 (emphasis in original) (citations omitted) (first quoting *Hammond v. North Slope Borough*, 645 P.2d 750, 759 (Alaska 1982); and then quoting *Se. Alaska Conservation Council v. State*, 665 P.2d 544, 549 (Alaska 1983)).

This is in stark contrast to how we review claims about individual constitutional rights violations.[48]

---

**48**      *See, e.g.*, *Larson v. Dep't of Corr., Bd. of Parole*, 476 P.3d 293, 301 n.55 (Alaska 2020) (" 'The right to privacy is not absolute' but is balanced against conflicting rights and interests." (quoting *Jones v. Jennings*, 788 P.2d 732, 738 (Alaska 1990))); *Planned Parenthood of the Great Nw. v. State*, 375 P.3d 1122, 1153 (Alaska 2016) ("Where a compelling state interest is shown, the right [to privacy] may be held to be subordinate to express constitutional powers such as the authorization of the legislature to promote and protect public health and provide for the general welfare." (quoting *Gray v. State*, 525 P.2d 524, 528 (Alaska 1974))).

For substantive due process violation claims, we have employed three review levels — strict scrutiny, intermediate scrutiny, and rational basis review:

> Under strict scrutiny, when a law substantially burdens a fundamental right, the State must articulate a *compelling* state interest that justifies infringing the right and must demonstrate that no less restrictive means of advancing the state interest exists.  Under intermediate scrutiny, when state action interferes with an individual's liberty interest that is not characterized as fundamental, the State must show a legitimate state interest and a "close and substantial relationship" between that interest and the chosen means of achieving it.  Under rational basis review, the party claiming a substantive due process violation has the burden of showing that there is no rational basis for the challenged legislation. "This burden is a heavy one, for if any conceivable legitimate public policy for the enactment is apparent on its face or is offered by those defending the enactment, the opponents of the measure must disprove the factual basis for such a justification."

*Doe v. Dep't of Pub. Safety*, 444 P.3d 116, 125-26 (Alaska 2019) (emphasis in original) (first quoting *Sampson v. State*, 31 P.3d 88, 91 (Alaska 2001); and then quoting *Concerned Citizens of S. Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974)).

(continued...)

## III. FACTS AND PROCEEDINGS IN THIS CASE

In August 2017 over a dozen young Alaskans (plaintiffs[49]) petitioned the Alaska Department of Environmental Conservation to adopt an agency rule ensuring carbon dioxide[50] and greenhouse gas emissions[51] (collectively carbon emissions) have

---

[48]    (...continued)
When evaluating equal protection claims, we apply a "flexible 'sliding scale' test" involving a three-step analysis:

> First, we determine what weight should be afforded the constitutional interest impaired by the challenged enactment. The nature of the interest is the most important variable in fixing the appropriate level of review. Second, we examine the purposes served by a challenged statute. Depending on the level of review determined, the state may be required to show only that its objectives were legitimate, at the low end of the continuum, or, at the high end of the scale, that the legislation was motivated by a compelling state interest. Third, an evaluation of the state's interest in the particular means employed to further its goals mut be undertaken.

*Jones v. State, Dep't of Revenue*, 441 P.3d 966, 978 (Alaska 2019) (quoting *Ross v. State, Dep't of Revenue*, 292 P.3d 906, 909-10 (Alaska 2012)).

[49]    Plaintiffs — some of whom are expressly stated to be Alaska Natives — and their ages when suit was filed are:  Summer Sagoonick of Unalakleet, 17; Esau Sinnok of Shishmaref, 20; Linnea L. of Gustavus, 14; Tasha Elizarde of Juneau, 19; Cade Terada of Dutch Harbor, 19; Kaytlyn Kelly of Palmer, 18; Brian Conwell of Dutch Harbor, 19; Jode Sparks of Sterling, 18; Margaret "Seb" Kurland of Juneau, 18; Lexine D. of Fort Yukon, 9; Elizabeth Bessenyey of Anchorage, 18; Vanessa Duhrsen of Anchorage, 18; Ananda Rose Ahtahkee L. of Anchorage, 8; Griffin Plush of Seward, 21; and Cecily and Lila S. of Homer, 8 and 6, respectively.

[50]    *See* Gökçe Günel, *What Is Carbon Dioxide? When Is Carbon Dioxide?*, 39 POL. & LEGAL ANTHROPOLOGY REV. 33 (2016) ("The *Oxford English Dictionary* defines carbon dioxide as 'a colorless, odorless gas produced by the burning of organic compounds and fossil fuels, by the processes of respiration and decomposition, and by
(continued...)

a "reduction trajectory that is based on best climate science."[52] The proposed rule called for the Department to "regulate stationary and mobile sources of [carbon] emissions and the extraction of fossil fuels" in Alaska to reduce carbon emissions to "at least 85% below 1990 levels by 2050" — an estimated global reduction necessary to slow climate change and lower global atmospheric carbon emission levels to a specified level by 2100. The proposed rule also required the Department to publish an annual accounting of the State's progress in addressing carbon emissions and to "adopt a Climate Action Plan to meet the reduction requirements specified."

The Department responded in September, denying the petition but assuring plaintiffs that addressing climate change was a State priority. The Department explained that the proposed rule — by "establish[ing] broad policy goals" rather than directly affecting the public or regulating the agency's interactions with the public — did not meet the statutory definition of "regulation";[53] likely exceeded the Department's rule-

---

[50]    (...continued)
volcanic activity, and absorbed by plants during photosynthesis.' . . . . In smaller type, the *OED* concludes[:] 'The increasing quantity of atmospheric carbon dioxide produced by the burning of fossil fuels is widely believed to augment the greenhouse effect and lead to global warming.' " (quoting *Carbon Dioxide*, OXFORD ENGLISH DICTIONARY (3d ed. 2008))).

[51]    Plaintiffs described greenhouse gas emissions in their rule-making petition as "any gas that has contributed to anthropogenic global warming." *See also id.*

[52]    *See* AS 44.62.220 ("Unless the right to petition for adoption of a regulation is restricted by statute to a designated group or the procedure for the petition is prescribed by statute, an interested person may petition an agency for the adoption or repeal of a regulation . . . .").

[53]    *See* AS 44.62.640(a)(3) (defining "regulation" as "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of a rule, regulation, order, or standard adopted by a state agency to implement, interpret,
(continued...)

making authority granted by statute;[54] and was "inconsistent with practical and fiscal constraints" on the Department and the State. The Department advised plaintiffs that resource development and environmental policy questions are "best addressed in partnership with the Legislature" and encouraged them "to continue to engage" with the executive and legislative branches "in seeking creative solutions to addressing climate change in Alaska."

A month later plaintiffs filed a superior court lawsuit against the State and various agencies and officers. Plaintiffs challenged the Department's denial of the rule-making petition as a violation of their constitutional rights and made additional constitutionally based claims for declaratory and injunctive relief regarding what they described as the State's "Climate and Energy Policy." The State later moved to dismiss the lawsuit.[55] In April 2018 the superior court heard arguments on the dismissal motion.

In August plaintiffs amended their complaint, adding specificity to their allegations about Alaska climate change and expressly referring to the legislature's

---

[53]    (...continued)
or make specific the law enforced or administered by it"). " '[R]egulation' includes . . . 'guides to enforcement,' 'interpretative bulletins,' 'interpretations,' and the like, that have the effect of rules, orders, regulations, or standards of general application," *id.*, but "not every agency action or decision constitutes a regulation," *Chevron, U.S.A., Inc. v. State, Dep't of Revenue*, 387 P.3d 25, 35-36 (Alaska 2016). An agency action is a regulation if it meets two criteria: First, the action must "implement[], interpret[], or make[] specific the law enforced or administered by the agency"; second, the action must "affect[] the public" or be "used by the agency in dealing with the public." *Id.* at 36 (quoting *State, Dep't of Nat. Res. v. Nondalton Tribal Council*, 268 P.3d 293, 300-01 (Alaska 2012)).

[54]    *Cf.* AS 46.03.020(10)(A) (authorizing Department to promulgate regulations regarding "control, prevention, and abatement of air . . . pollution").

[55]    *See* Alaska R. Civ. P. 12(b)(6) (allowing dismissal for failure to state claim upon which relief can be granted).

energy policy in AS 44.99.115.[56]  The amended complaint detailed each plaintiff's alleged harms and sought to "enforce sections 1, 7, and 21 of Article I[57] . . . and Article VIII[58] of the Alaska Constitution."

The first plaintiff named in the amended complaint, for example, alleged that climate change is having a devastating effect on his home, subsistence lifestyle, and cultural traditions.  This is manifested, he alleged, in erosion of inhabited seacoast due to loss of sea ice that "has historically been a buffer against storms, storm surges, and flooding"; "accelerating thaw of the permafrost underlying [his home] community," causing both erosion and food-cellar flooding; damage to traditional hunting practices

---

[56]    *See supra* § II.B.

[57]    Providing, in relevant part:

> § 1.  Inherent Rights.  This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the law; and that all persons have corresponding obligations to the people and to the State.
>
> . . . .
>
> § 7.  Due Process.  No person shall be deprived of life, liberty, or property, without due process of law. The right of all persons to fair and just treatment in the course of legislative and executive investigations shall not be infringed.
>
> . . . .
>
> § 21.  Construction.  The enumeration of rights in this constitution shall not impair or deny others retained by the people.

[58]    *See supra* § II.A.

and loss of game due to thinning sea ice; inadequate snow cover for necessary winter travel; harm to prey animals such as walrus, seal, and caribou, both directly and through damage to their food supply; increased wildfires damaging the air quality necessary for outdoor recreation; and feelings of "anxiety, stress and loss." Other plaintiffs alleged specific harm to their recreational opportunities, diet, physical and mental health, and traditional cultural activities.

Plaintiffs also made specific factual allegations about State actors' roles in "causing, contributing to, and exacerbating climate change," primarily by permitting and promoting fossil fuel extraction and other activities contributing to dangerous levels of atmospheric carbon emissions. Plaintiffs set out factual allegations underlying their assertions that the State has long been aware of climate change's harmful effects and of the role the State's policies play in exacerbating the problem. They also detailed carbon emissions produced in Alaska over several relevant time spans and identified the sources of these emissions.

Plaintiffs described "overwhelming scientific consensus that human-caused climate change is occurring"; sources of human-caused increase in carbon emissions; impact on sea levels, ocean acidification, human disease, and mental health disorders; and extreme weather events such as floods and hurricanes. Plaintiffs focused on climate-change impacts in Alaska, detailing increased temperatures, effects on Arctic sea ice and effects on marine mammals and coastal communities, glacial melt and its "profound impacts on freshwater and marine aquatic resources," and permafrost thawing. They described wildfires, spruce beetle infestations, ocean acidification, and threats to salmon, other fish species, and a variety of land-based plants and mammals. They detailed these changes' effects on Alaskans, amplifying individual plaintiffs' allegations about damaged communities, subsistence hunting and fishing, traditional and cultural activities, and health. Plaintiffs also alleged "[e]conomic and financial losses from climate change

[related to] healthcare, wildlife and fisheries management, disaster relief, infrastructure construction and repair, and energy development, among others."

Plaintiffs sought a declaratory judgment stating that: (1) they have a "fundamental and inalienable constitutional right[] to . . . a stable climate system that sustains human life and liberty"; (2) the State has a duty under the public trust doctrine to protect Alaska's natural resources; (3) the State has exacerbated climate change in violation of plaintiffs' individual constitutional rights; (4) the State has put plaintiffs in danger by failing to reduce Alaska's carbon emissions; (5) the State has discriminated against plaintiffs as members of a protected age-based class who will suffer from climate change effects for a longer period of time than will older people; (6) the State has violated its duty to protect Alaska's natural resources; and (7) the Department's denial of the rule-making petition violated plaintiffs' individual constitutional rights. Plaintiffs also requested injunctive relief requiring the State to: (1) stop implementing its energy policy in violation of their rights; (2) "prepare a complete and accurate accounting of Alaska's [carbon] emissions," including "in-boundary and extraction-based emissions" and "emissions attributable to fossil fuels extracted in Alaska and transported and combusted out of state"; and (3) develop and submit to the court "an enforceable state climate recovery plan . . . consistent with global emissions reductions rates necessary to stabilize the climate system."

After plaintiffs filed their amended complaint, the parties notified the superior court that they had agreed no further briefing or arguments were necessary for the court to rule on the State's pending dismissal motion. In October the court granted the State's motion, dismissing plaintiffs' injunctive relief claims because they implicated non-justiciable political questions, dismissing plaintiffs' requests for declaratory relief on prudential grounds, and concluding that the Department's denial of plaintiffs' rule-making petition complied with statutory requirements and was not arbitrary.

Plaintiffs appeal.

## IV. DISCUSSION

### A. Dismissal Of Plaintiffs' Declaratory Judgment And Injunctive Relief Claims

#### 1. Standard of review

"We review a motion to dismiss de novo, construing the complaint liberally and accepting as true all factual allegations," and we generally "do not consider materials outside the complaint and its attachments."[59] "[M]otions to dismiss are disfavored,"[60] and it must be "beyond doubt that the plaintiff can prove no set of facts that would entitle [the plaintiff] to relief" before dismissal will be granted.[61] "Even if the relief demanded is unavailable, the claim should not be dismissed as long as some relief might be available on the basis of the alleged facts."[62] "[W]e review de novo the question of whether a case should be dismissed on prudential grounds."[63]

---

[59]     *Pedersen v. Blythe*, 292 P.3d 182, 184 (Alaska 2012). Plaintiffs' 102-page amended complaint is replete with factual allegations, ranging from the very local to the global and stating very specific harms claimed by individual plaintiffs. For purposes of the discussion that follows, we must presume as true and provable at trial that the State knows its actions have exacerbated and will continue to exacerbate climate change, causing serious harms to the individual plaintiffs and contributing to statewide, nationwide, and global damage that is accelerating toward climate catastrophe. Plaintiffs assert that the superior court erred by failing to consider their factual allegations in this light, but because we independently review plaintiffs' complaint in our consideration of its dismissal, we do not address that assertion of error.

[60]     *Adkins v. Stansel*, 204 P.3d 1031, 1033 (Alaska 2009).

[61]     *Catholic Bishop of N. Alaska v. Does 1-6*, 141 P.3d 719, 722 (Alaska 2006).

[62]     *Adkins*, 204 P.3d at 1033.

[63]     *Kanuk ex rel. Kanuk v. State, Dep't of Nat. Res.*, 335 P.3d 1088, 1092
(continued...)

### 2. *Kanuk ex rel. Kanuk v. State, Department of Natural Resources*

Plaintiffs' factual allegations and legal claims are similar to those addressed in our 2014 *Kanuk ex rel. Kanuk v. State, Department of Natural Resources* decision.[64] In that case, like this one, the plaintiffs sought a court mandate for substantive State action in response to potentially catastrophic climate change. Because we affirmed the superior court's denial of any relief in *Kanuk*, many arguments in this appeal focus on factual and procedural comparisons of the two cases.

The *Kanuk* plaintiffs were a diverse group of young Alaskans who claimed the State had violated duties under the Alaska Constitution and the public trust doctrine by failing to take steps to protect the atmosphere and curb carbon emissions.[65] The superior court dismissed their complaint, holding that their requests for declaratory and injunctive relief were non-justiciable political questions; the *Kanuk* plaintiffs appealed.[66] We affirmed the dismissal, but for slightly different reasons.

We first held that the *Kanuk* plaintiffs had standing[67] and that their claims were not barred by sovereign immunity.[68] We held that three claims — asking that the

---

[63]    (...continued)
(Alaska 2014).

[64]    *Id.* at 1090-91.

[65]    *Id.*

[66]    *Id.* at 1091.

[67]    *Id.* at 1092-95 (concluding plaintiffs had interest-injury standing because "the complaint shows direct injury to a range of recognizable interests[, e]specially in light of our broad interpretation of standing and our policy of promoting citizen access to the courts").

[68]    *Id.* at 1095-96 (rejecting sovereign immunity defense because "[t]he duty
(continued...)

court order the State to use the best available science, lower carbon emissions, and prepare a carbon emission accounting — were properly dismissed as non-justiciable because they involved policy questions within other government branches' particular competence.[69] We disagreed with the superior court's decision that the remaining claims also presented non-justiciable political questions, holding that declaratory judgment claims on the nature of the public trust doctrine were justiciable because whether the State has breached a legal duty is a question we can answer, assuming we first can identify the duty at issue.[70] But despite the claims' justiciability, we held dismissal on prudential grounds was proper because the declaratory relief sought would not "clarify and settle [the] legal relations" between the parties and thus ultimately would "fail to serve the principal prudential goals of declaratory relief."[71]

### 3.  Justiciability and prudential considerations in this matter

We apply *Kanuk*'s analytical framework to determine whether plaintiffs' claims are justiciable.  This requires answering two questions:

> (1) [W]hether deciding the claim would require us to answer questions that are better directed to the legislative or executive branches of government (the "political question" doctrine), and (2) whether there are other reasons — such as ripeness, mootness, or standing — that persuade us that,

---

[68]    (...continued)
the State is alleged to have breached . . . is a fiduciary duty based on article VIII of the Constitution and the public trust doctrine, not tort law").

[69]    *Id.* at 1097-99.

[70]    *Id.* at 1100.

[71]    *Id.* at 1101-02 (quoting *Lowell v. Hayes*, 117 P.3d 745, 755 (Alaska 2005)).

though the case is one we are institutionally capable of deciding, prudence counsels that we not do so.[72]

As we explain below, plaintiffs' injunctive relief claims present non-justiciable political questions. And although plaintiffs' declaratory relief claims do not necessarily present non-justiciable political questions, the superior court properly dismissed them on prudential grounds after correctly determining that it could not grant injunctive relief.

### a. Plaintiffs' injunctive relief claims and our non-justiciable political questions analysis

We previously have explained that the separation of powers doctrine prohibits Alaska courts from resolving purely political questions.[73] But "merely characterizing a case as political in nature will [not] render it immune from judicial scrutiny."[74] There are no "exact boundaries between the political and the justiciable," but we identify political questions "by applying the test announced by the United States Supreme Court in *Baker v. Carr*."[75] *Baker* lists six factors, at least one of which is "[p]rominent on the surface" of any case involving a political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an

---

[72] *Id.* at 1096 (footnote omitted).

[73] *Id.*; *see also Abood v. Gorsuch*, 703 P.2d 1158, 1160 (Alaska 1985) ("There are certain questions involving coordinate branches of the government, sometimes unhelpfully called political questions, that the judiciary will decline to adjudicate."); *Malone v. Meekins*, 650 P.2d 351, 356 (Alaska 1982) (citing *Baker v. Carr*, 369 U.S. 186, 210 (1962)).

[74] *Malone*, 650 P.2d at 356.

[75] *Kanuk*, 335 P.3d at 1096 (citing 369 U.S. at 217).

initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.[76]

"Unless one of these formulations is inextricable from the case . . . there should be no dismissal for non-justiciability on the ground of a political question's presence."[77]

Plaintiffs sought an injunction requiring the State to: (1) stop implementing its statutory energy policy in violation of their asserted constitutional rights; (2) "prepare a complete and accurate accounting of Alaska's [carbon] emissions"; and (3) work with the Department to develop and submit to the superior court "an enforceable [S]tate climate recovery plan . . . consistent with global emissions reductions rates necessary to stabilize the climate system."

These closely resemble the requests in *Kanuk*. The *Kanuk* plaintiffs sought declaratory and injunctive relief, requesting that the court: (1) "declare that the State[]" has a public trust "obligation to protect the atmosphere" by implementing the "best available science"; (2) "order the State 'to prepare a full and accurate accounting of Alaska's current carbon dioxide emissions' "; and (3) "order the State to reduce emissions 'by at least 6% [annually]' " until 2050.[78] We held that the injunctive relief claims presented non-justiciable political questions "under several of the *Baker*

---

[76]     369 U.S. at 217.

[77]     *Id.*

[78]     *Kanuk*, 335 P.3d at 1097.

factors."[79] We said the claims most obviously implicated the third factor by requiring the court to make an "initial policy determination."[80] We explained that "[t]he limited institutional role of the judiciary supports a conclusion that the science- and policy-based inquiry [at issue in *Kanuk* was] better reserved for executive-branch agencies or the legislature."[81]

The superior court in this case concluded that plaintiffs' injunctive relief claims were "materially indistinguishable" from those in *Kanuk* and denied relief. Plaintiffs contend the court made two errors. They first argue that the court (and our *Kanuk* decision) should not have focused on the requested relief to determine whether the "*claims* [themselves] present a political question." (Emphasis in original.) And they argue that, unlike the *Kanuk* plaintiffs, they point to an initial State legislative policy determination and affirmative State actions allegedly violating their constitutional rights. Plaintiffs contend that these differences render their claims justiciable. We consider and reject these arguments in turn.

### i. The superior court did not err by considering the injunctive relief requested by the plaintiffs.

Plaintiffs argue that the superior court "obfuscate[d] the proper [political question] inquiry" by focusing on the requested relief instead of the claims presented. But we took the very same approach in *Kanuk*,[82] and a review of our case law reveals

---

[79] *Id.* at 1097-99.

[80] *Id.* at 1097.

[81] *Id.* at 1099.

[82] *See id.* at 1097-98.

that the remedy is a relevant consideration in the political question analysis.[83] Although plaintiffs call this approach "an anomaly," several federal circuit courts of appeal decisions demonstrate that relief is routinely considered during the political question analysis.[84] Categorizing past State actions as a single energy policy "implemented

---

[83] *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 913-14 (Alaska 2001) (rejecting argument that political question doctrine barred judicial consideration because striking regulation, which would require legislature to alter appropriations, is precisely type of remedy judiciary is competent to give); *Abood v. League of Women Voters*, 743 P.2d 333, 336 (Alaska 1987) (holding claim alleging violation of rules of legislative procedure was non-justiciable because Constitution permits legislature to make its own procedural rules and noting "to hold that these claims are justiciable places the judiciary in direct conflict with the legislature's constitutionally authorized rulemaking prerogative"); *Malone v. Meekins*, 650 P.2d 351, 356 (Alaska 1982) (concluding that declaring legislative house speaker election invalid would be "improper" even if previous speaker's removal was unconstitutional and illegal as argued on appeal).

[84] *Schroder v. Bush*, 263 F.3d 1169, 1174-76 (10th Cir. 2001) ("[I]t is clear to us that Appellants' request that courts maintain market conditions, oversee trade agreements, and control currency . . . would require courts to make 'initial policy determinations' in an area devoid of 'judicially discoverable and manageable standards' . . . ."); *Brown v. Hansen*, 973 F.2d 1118, 1121 (3d Cir. 1992) ("[The political question doctrine] precludes courts from granting relief that would violate the separation of powers mandated by the United States Constitution."); *Koohi v. United States*, 976 F.2d 1328, 1332 (9th Cir. 1992) (noting injunctive relief claims "may require the courts to engage in the type of operational decision-making beyond their competence . . . [and] are far more likely to implicate political questions"); *Gordon v. Texas*, 153 F.3d 190, 193-95 (5th Cir. 1998) (analyzing claims' justiciability based on relief sought; *see also Republic of Marshall Islands v. United States*, 79 F. Supp. 3d 1068, 1074 (N.D. Cal. 2015), *aff'd sub nom. Republic of Marsh. Islands v. United States*, 865 F.3d 1187 (9th Cir. 2017) (dismissing case as political question because court "lack[ed] the standards necessary to fashion the type of injunctive relief" sought); *Barasich v. Columbia Gulf Transmission Co.*, 467 F. Supp. 2d 676, 685 (E.D. La. 2006) ("[T]he nature of the relief sought by the plaintiffs in this action supports a determination that this suit does not fall under the second prong of the political question test."); *Ibrahim v. Titan Corp.*, 391 F.

(continued...)

through [its] historical and ongoing affirmative aggregate and systemic actions" rather than contemporaneously challenging proposed agency action is an unusual argument. To the extent our focus on the requested relief could be considered unusual, it is in keeping with the nature of plaintiffs' argument.

Contrary to plaintiffs' argument, *Baker* does not foreclose our approach. After explaining that the claims in *Baker* were justiciable, the United States Supreme Court cursorily wrote: "[I]t is improper now to consider what remedy would be most appropriate if appellants prevail at the trial."[85] But the Court was not excluding from the political question analysis all consideration of remedies; it was acknowledging that an appellate court generally should not speculate about hypothetical remedies *after* determining that a trial court improperly dismissed claims as non-justiciable. That is not the posture of this case. The superior court thus did not err by considering plaintiffs' requested relief as part of its political question analysis.

### ii. Plaintiffs' injunctive relief claims present non-justiciable political questions.

"[T]he relationship between the judiciary and the coordinate branches of the . . . Government . . . gives rise to the 'political question.' "[86] The political question doctrine maintains the separation of powers by "exclud[ing] from judicial review those

---

[84] (...continued)
Supp. 2d 10, 15 (D.D.C. 2005) ("An action for damages arising from the acts of private contractors and not seeking injunctive relief does not involve [a political question] . . . .").

[85] 369 U.S. 186, 198 (1962).

[86] *Malone*, 650 P.2d at 356 (quoting *Baker*, 369 U.S. at 210).

controversies which revolve around policy choices and value determinations constitutionally committed for resolution to" the political branches of government.[87]

We conclude that plaintiffs' injunctive relief claims present non-justiciable political questions, as did the claims in *Kanuk*.[88] We do not reach this conclusion lightly; Alaska courts have a duty to decide cases properly before them.[89] But respect for, not dereliction of, our constitutional duty warrants this conclusion. The Constitution's text, the separation of powers doctrine, and *Kanuk*'s sound precedent prevent us making the legislative policy judgments necessary to grant the requested injunctive relief.

As explained earlier, article VIII enshrines an overarching constitutional policy of making natural public resources available for maximum use consistent with the public interest.[90] It explicitly directs the legislature (and not the judiciary) to manage and develop the State's natural resources for the maximum common use and benefit of all Alaskans.[91] We have long recognized that, in light of this constitutional delegation of authority, our role in reviewing legislative decisions about management and development

---

[87]   *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

[88]   *See Kanuk ex rel. Kanuk v. State, Dep't of Nat. Res.*, 335 P.3d 1088, 1097-99 (Alaska 2014).

[89]   *See State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 913 (Alaska 2001) ("Under Alaska's constitutional structure of government, 'the judicial branch . . . has the constitutionally mandated duty to ensure compliance with the provisions of the Alaska Constitution, including compliance by the legislature.' " (alteration in original) (quoting *Malone*, 650 P.2d at 356)).

[90]   Alaska Const. art VIII, § 1; *see supra* § II.A.

[91]   Alaska Const. art VIII, § 2; *see supra* § II.A; *see also Sullivan v. REDOIL*, 311 P.3d 625, 635 (Alaska 2013) ("The legislature is tasked with the duty to determine the procedures necessary for ensuring the State's resources are used 'for the maximum benefit of its people.' " (quoting Alaska Const. art VIII, § 2)).

of natural resources is necessarily limited. Our "hard look" approach to cases involving the proper balance between development and environmental concerns derived from a recognition that we cannot, and should not, substitute our judgment for that of the political branches.[92]

We recognize that article VIII is not a complete delegation of power to the legislature;[93] we have a duty to ensure compliance with constitutional principles,[94] and we have a duty to redress constitutional rights violations.[95] But the nature of plaintiffs'

---

[92] *See Sullivan*, 311 P.3d at 635 ("We have said that to ensure these [constitutional] principles are followed, it is necessary for the State to take a 'hard look' at all factors material and relevant to the public interest . . . ."); *see also Se. Alaska Conservation Council, Inc. v. State*, 665 P.2d 544, 549 (Alaska 1983); *Hammond v. North Slope Borough*, 645 P.2d 750, 759 (Alaska 1982).

[93] *See Brooks v. Wright*, 971 P.2d 1025, 1033 (Alaska 1999) ("[T]he legislature does *not* have exclusive law-making powers over natural resource issues merely because of the state's management role over wildlife set forth in Article VIII of the Alaska Constitution . . . ." (emphasis in original)); *cf. Malone*, 650 P.2d at 356, 359 (holding that legislature's internal rules of procedure were textually committed by Alaska Constitution and that "except in extraordinary circumstances, as where the rights of persons who are not members of the legislature are involved, it is not the function of the judiciary to require that the legislature follow its own rules").

[94] *See, e.g.*, *McDowell v. State*, 785 P.2d 1, 8-9 (Alaska 1989) (striking down statutory provision establishing rural residency requirements for subsistence hunting and fishing as violating article VIII equal use provisions); *Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 496 (Alaska 1988) (holding "minimum requirement of [the public trust] duty [constitutionalized in the common use clause] is a prohibition against any monopolistic grants or special privileges," and noting "we are compelled to strike down any statutes or regulations that violate this principle").

[95] *Valley Hosp. Ass'n v. Mat-Su Coalition for Choice*, 948 P.2d 963, 971-72 (Alaska 1997) ("[W]e cannot defer to the legislature when infringement of a constitutional right results from legislative action.").

as-applied claims upsets our usual approach to reviewing State agency action.[96] Plaintiffs asserted that the State has contributed to climate change and resulting violations of their individual constitutional rights "by and through [the statutory energy policy], implemented through [its] historical and ongoing affirmative aggregate and systemic actions." Plaintiffs' requested remedy thus involves more than striking down a specific statute or regulation or reversing an agency's specific decision. Plaintiffs ask the judicial branch to establish constitutional common law controlling State policy about the appropriate balancing of resource development against environmental protection. And plaintiffs ask us to jettison the constitutional mandate that the legislature manage natural resources in the public interest and for the maximum benefit to Alaskans collectively.

Plaintiffs essentially seek to impose ad hoc judicial natural resources management based on case-by-case adjudications of individual fundamental rights. Judges would be deciding the extent of individual Alaskans' constitutional right to some level of development or conservation under article VIII based on those individual Alaskans' arguments about what would provide them "a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry" under article I. But the Constitution expressly delegated to the legislature the duty to balance

---

[96]     A litigant may challenge the constitutionality of a statute or government policy in two different ways. A facial challenge alleges that a statute or policy is unconstitutional "as enacted"; we will uphold a facially challenged statute or policy "even if it might occasionally create constitutional problems in its application, as long as it 'has a plainly legitimate sweep.' " *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 1000 (Alaska 2019) (quoting *Planned Parenthood of the Great Nw. v. State*, 375 P.3d 1122, 1133 (Alaska 2016)). An as-applied challenge alleges that "under the facts of the case[,] application of the statute [or policy] is unconstitutional. Under other facts, however, the same statute [or policy] may be applied without violating the constitution." *State v. ACLU of Alaska*, 204 P.3d 364, 372 (Alaska 2009).

competing priorities for the collective benefit of all Alaskans. It thus is impossible to grant plaintiffs' requested injunctive relief without also infringing on an area constitutionally committed to the legislature, abandoning our "hard look" standard of review for natural resource decisions, and disrespecting our coordinate branches of government by supplanting their policy judgments with our own normative musings about the proper balance of development, management, conservation, and environmental protection.[97]

Because we cannot grant the requested relief using factual and legal analyses alone, plaintiffs' claims are not meaningfully distinguishable from the claims brought in *Kanuk*.[98] We rejected the *Kanuk* plaintiffs' attempt to obtain an injunction requiring the State to account for and reduce its emissions based on the "best available science" because it would have involved "underlying policy choices [that were] not ours

---

[97] *Baker v. Carr*, 369 U.S. 186, 217 (1962) (noting political question exists if there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department, . . . a lack of judicially discoverable and manageable standards for resolving it; . . . the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [or] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government"); *see also Alperin v. Vatican Bank*, 410 F.3d 532, 544 (9th Cir. 2005) (noting *Baker* factors often "collaps[e] into one another").

[98] *Kanuk ex rel. Kanuk v. State, Dep't of Nat. Res.*, 335 P.3d 1088, 1097 (Alaska 2014) (noting political question doctrine is implicated "when, to resolve a dispute the court must make a policy judgment of a legislative nature, rather than resolving the dispute through legal and factual analysis" (quoting *Equal Emp't Opportunity Comm'n v. Peabody W. Coal Co.*, 400 F.3d 774, 784 (9th Cir. 2005))); *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) (noting "courts are fundamentally underequipped to formulate [large scale] policies or develop standards for matters not legal in nature" (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1379 (D.C. Cir. 1981))).

to make in the first instance."[99]  The underlying policy choices were legislative because they:  (1) required an "informed assessment of competing interests";[100] (2) largely depended on the application of "scientific, economic, and technological resources";[101] and (3) would be best made with the input of various stakeholders outside of an inflexible trial court record.[102]  We stated:

> [Although] the science of anthropogenic climate change is compelling, government reaction to the problem implicates realms of public policy besides the objectively scientific. The legislature — or an executive agency entrusted with rule-making authority in this area — may decide that employment, resource development, power generation, health, culture, or other economic and social interests militate against implementing what the plaintiffs term the "best available science" in order to combat climate change.[103]

*Kanuk*'s core holding on this issue is that the "science- and policy-based inquiry" and policy choices necessary to implement resource development are "better reserved" for the political branches.[104]  That holding applies to this case.

Granting injunctive relief would require making the very same legislative-like policy choices that in *Kanuk* we said courts could not make.  Plaintiffs primarily

---

[99]     *Kanuk*, 335 P.3d at 1098.

[100]     *Id.* (quoting *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 427 (2011)).

[101]     *Id.* at 1099 (quoting *Am. Elec. Power Co.*, 564 U.S. at 428).

[102]     *See id.* (noting that courts may not commission scientific studies, convene groups of experts, seek public input under notice-and-comment procedures, or look beyond record).

[103]     *Id.* at 1098-99 (footnote omitted).

[104]     *Id.* at 1099.

seek an injunction mandating that the State develop a "climate recovery plan" that is "consistent with global emissions reduction rates necessary to stabilize the climate system." Plaintiffs further seek to have the court "[r]etain continuing jurisdiction [to] enforc[e]" that order. Granting an injunction necessarily would impose a court-made policy judgment on the other political branches that no competing interest is more important than implementing the best available science, the plaintiffs' presumptive source of the reduction rate.[105] But this is beyond the "limited institutional role of the judiciary" because it requires a legislative policy judgment.[106]

Plaintiffs pleaded their claims differently than the *Kanuk* plaintiffs, but that does not change our analysis. We said in *Kanuk* that the "underlying policy choices" were not the courts' to make "in the first instance," perhaps unintentionally suggesting that future plaintiffs could resolve the *Kanuk* complaint's shortcomings merely by identifying some relevant initial legislative policy choice.[107] Plaintiffs identify the State's codified energy policy as the initial policy determination, although, as we noted above, plaintiffs really are challenging how the policy is being applied rather than the policy itself. But plaintiffs interpret the political question doctrine too rigidly and formalistically. The barrier in *Kanuk* was not merely absence of an initial policy judgment; the *Kanuk* plaintiffs asked the courts to make and enforce a particular legislative-like policy judgment and impose it on the other political branches. They sought to have courts impose the policy judgment that, when undertaking resource

---

[105] *See id.* at 1098-99 (explaining judgment would be legislative because it would require informed assessment of competing interests, depend on application of scientific, economic, and technological resources, and best be made with access to information beyond limited trial court record).

[106] *Id.*

[107] *Id.* at 1098.

development under Alaska's constitutional directive and various statutory policy pronouncements, the State must prioritize at all costs the best available science or the least climate-damaging activities. This proposed policy judgment would require continuing jurisdiction to ensure that the political branches implement what courts conclude is the appropriate balancing of interests in developing Alaska's "resources . . . for maximum use consistent with the public interest."[108] Asking courts to impose and enforce such a policy judgment presents a non-justiciable political question.

Plaintiffs point to *Plata v. Brown*, a United States Supreme Court decision upholding an injunction requiring California to reduce its prison population to 137.5% of building design capacity to cure Eighth Amendment violations,[109] and they suggest that we likewise should "set the constitutional floor necessary for preservation of [p]laintiffs' rights and leave to [the State] the specifics of developing and implementing a compliance plan." But *Plata*'s remedy was granted in accordance with the Prison Litigation Reform Act, which authorized federal courts to require the release of prisoners as a remedy to cure federal rights violations under certain conditions.[110] Any separation of powers concerns therefore were less salient because Congress had authorized the requested remedy.[111] By contrast, the remedy plaintiffs seek in this case would require courts to make decisions that article VIII has committed to the legislature, and separation of powers considerations therefore are clearly implicated.[112]

---

[108]    Alaska Const. art. VIII, §1.

[109]    563 U.S. 493, 509-10, 533 (2011).

[110]    *Id.* at 511; *see also* 18 U.S.C. § 3626(a).

[111]    *See Plata*, 563 U.S. at 511.

[112]    Plaintiffs also cite several United States Supreme Court opinions

(continued...)

The Alaska Constitution and relevant statutes do not leave plaintiffs without recourse. They may challenge discrete actions implementing State resource development and environmental policies.[113] They may attempt to legislate by initiative.[114] They also may continue advocating their position to the public and working to generate enough legislative political will to enact their preferred policies and implementations into law. But having a majority of elected legislators disagree with or lack the political will to

---

[112] (...continued)
concerning unconstitutional racial discrimination in public schools and housing: *Hills v. Gautreaux*, 425 U.S. 284 (1976); *Brown v. Bd. of Educ.*, 349 U.S. 294 (1955); *Bolling v. Sharpe*, 347 U.S. 497 (1954). Plaintiffs do not explain how these cases are legally significant to the issue before us. We note that the issues are dissimilar and that, although the remedies granted in the cited cases may have been complex or broad-based, granting the necessary remedies did not require the Court to make policy decisions explicitly constitutionally committed to Congress.

[113] *See, e.g.*, *Nunamta Aulukestai v. State, Dep't of Nat. Res.*, 351 P.3d 1041, 1064 (Alaska 2015) (determining certain mineral exploration permits constitute interest in land and requiring public notice); *Sullivan v. REDOIL*, 311 P.3d 625, 637 (Alaska 2013) (interpreting Alaska Constitution to require consideration of cumulative impacts throughout course of oil and gas projects); *Cook Inlet Keeper v. State, Off. of Mgmt. & Budget, Div. of Governmental Coordination*, 46 P.3d 957, 962-66 (Alaska 2002) (requiring State to review proposed offshore exploratory drilling site waste discharge for compliance with coastal water protection program); *N. Alaska Env't Ctr. v. State, Dep't of Nat. Res.*, 2 P.3d 629, 639 (Alaska 2000) (requiring best interests finding to grant utility-related right-of-way); *Trs. for Alaska v. State, Dep't of Nat. Res.*, 795 P.2d 805, 812 (Alaska 1990) (finding oil and gas lease sale deficient for failing to review associated environmental problems).

[114] Alaska Const. art. XI, § 1; *Pebble Ltd. P'ship ex rel. Pebble Mines Corp.v. Parnell*, 215 P.3d 1064, 1085 (Alaska 2009) (upholding ballot initiative intended to regulate large-scale mining).

enact or implement plaintiffs' preferred policies does not justify an unconstitutional judicial remedy.[115]

### b.     Plaintiffs' declaratory relief claims and prudential non-justiciability analysis

Plaintiffs also sought a declaratory judgment stating that: (1) plaintiffs have "fundamental and inalienable constitutional rights to life, liberty, and property . . . and other unenumerated rights, including the right[] to a stable climate system that sustains human life and liberty"; (2) the State has a public trust duty to protect Alaska's natural resources; (3) the State has violated plaintiffs' various constitutional rights by exacerbating climate change through its statutory energy policy; (4) the State has put plaintiffs in danger by not reducing Alaska's carbon emissions; (5) the State has discriminated against plaintiffs as members of a protected age-based class through its

---

[115]     *See Clinton v. City of New York*, 524 U.S. 417, 449 (1998) (Kennedy, J., concurring) ("Failure of political will does not justify unconstitutional remedies."). Appellate courts in other states also have concluded that claims requiring the judiciary to evaluate state energy-related policies may present political questions. *Aji P. ex rel. Piper v. Washington*, 480 P.3d 438, 447 (Wash. App. 2021) (concluding claims asking court to "address whether [Washington's] current [carbon emission] statutes and regulations sufficiently address climate change" presented "political questions" because they "inevitably involve resolution of questions reserved for the" political branches), *petition for review filed*, Petition for Discretionary Review, *Aji P. v. Washington*, No. 80007-8-I (Wash. Mar. 10, 2021); *Sanders-Reed ex rel. Sanders-Reed v. Martinez*, 350 P.3d 1221, 1227 (N.M. App. 2015) (concluding New Mexico "courts cannot independently regulate greenhouse gas emissions in the atmosphere . . . based solely upon a common law duty established under the public trust doctrine"); *Svitak ex rel. Svitak v. Washington*, 178 Wash. App. 1020, 1-2  (2013) (concluding claim presented "political question" on grounds that plaintiff asked "court to compel [Washington] to create an economy-wide regulatory program to address climate pollution" that "would necessarily involve resolution of complex social, economic, and environmental issues").

statutory energy policy; and (6) the State has violated its public trust duty to protect Alaska's natural resources.

As we stated in *Kanuk*:

The *Baker* factors for identifying non-justiciable issues do not apply to judicial interpretations of the constitution. Indeed, "[u]nder Alaska's constitutional structure of government, 'the judicial branch . . . has the constitutionally mandated duty to ensure compliance with the provisions of the Alaska Constitution.' " . . . [C]laims seeking primarily an interpretation of [the Alaska Constitution] and the public trust doctrine do not present non-justiciable political questions.[116]

Plaintiffs' declaratory relief claims, like those in *Kanuk*, do not necessarily present non-justiciable political questions. Plaintiffs seek an interpretation of the Alaska Constitution. They correctly note that we have a "constitutionally mandated duty to ensure [executive and legislative branch] compliance with the provisions of the Alaska Constitution."[117] But even if plaintiffs' declaratory relief claims do not present non-justiciable political questions, justiciability is not guaranteed.[118]

---

[116] 335 P.3d 1088, 1099-100 (Alaska 2014) (first and second alterations in original) (footnotes omitted) (quoting *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 913 (Alaska 2001)).

[117] *Malone v. Meekins*, 650 P.2d 351, 356 (Alaska 1982).

[118] The nature of prudential doctrines allows for case-by-case determination rather than adherence to bright-line rules. *See, e.g.*, *Johnson v. State*, 328 P.3d 77, 82 (Alaska 2014) ("[T]he general preservation rule [for appealable error] is not absolute, and it is subject to prudential exceptions."); *Alaskans for Efficient Gov't, Inc. v. State*, 153 P.3d 296, 298 (Alaska 2007) (noting that "rule against pre-election review [of initiative's constitutionality] is a prudential one" and "has never been absolute"); *Matanuska Elec. Ass'n v. Chugach Elec. Ass'n*, 99 P.3d 553, 559 (Alaska 2004) (observing that "the primary agency jurisdiction doctrine is one of prudence, and not an absolute jurisdictional limitation").

A claim also must present an "actual controversy" that "is appropriate for judicial determination" because it is "definite and concrete, touching the legal relations of parties having adverse legal interests . . . . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."[119] As in *Kanuk* we must determine whether plaintiffs' declaratory relief claims — absent the prospect of any concrete injunctive relief — present an actual controversy. The superior court concluded they do not. We agree.

We have discussed Alaska's declaratory judgment framework in light of its federal counterpart elsewhere and only briefly review it here.[120] Although Alaska courts may issue declaratory judgment when there is "an actual controversy," courts are not required to grant declaratory relief because it "is a 'nonobligatory remedy.' "[121] "[P]racticality and wise judicial administration" thus guide the discretionary decision to grant or deny declaratory relief.[122] And if a court declines to grant declaratory relief, it

---

[119] *Kanuk*, 335 P.3d at 1100 (alteration in original) (quoting *Jefferson v. Asplund*, 458 P.2d 995, 998-99 (Alaska 1969)); Declaratory Judgment Act, AS 22.10.020(g) ("In case of an actual controversy in the state, the superior court, upon the filing of an appropriate pleading, may declare the rights and legal relations of an interested party seeking the declaration, whether or not further relief is or could be sought.").

[120] *Kanuk*, 335 P.3d at 1100-03 (stating AS 22.10.020(g) was "intended to parallel [its] federal counterpart[], and we therefore interpret [it] in light of pertinent federal authority," and discussing framework for reviewing decisions to grant or deny declaratory judgment).

[121] *Lowell v. Hayes*, 117 P.3d 745, 755 (Alaska 2005) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995)).

[122] *Id.* (quoting *Wilton*, 515 U.S. at 288).

need not undertake a "wasteful expenditure of judicial resources" in "the futile exercise of hearing a case on the merits first."[123]

Prudential concerns often caution against issuing declaratory relief.[124] "We have explained that declaratory judgments are rendered to clarify and settle legal relations, and to 'terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.' "[125] Prudence therefore dictates that courts should not grant declaratory relief unless it will meaningfully accomplish these goals.[126] Consideration of these goals counsels against granting declaratory relief in this case, as it did in *Kanuk*.[127]

In *Kanuk* we concluded that declaratory relief "could serve to clarify the legal relations at issue, [but] it would certainly not 'settle' them."[128] We listed five reasons the parties' legal relations would have remained unsettled, because declaratory relief would: (1) have had "no immediate impact on greenhouse gas emissions in Alaska"; (2) not have compelled "the State to take any particular action"; (3) not have protected "the plaintiffs from the injuries they allege[d] in their complaint"; (4) "not tell the State what it need[ed] to do . . . to satisfy its trust duties and thus avoid future litigation"; (5) conversely . . . not provide the plaintiffs any certain basis on which to

---

[123]    *Wilton*, 515 U.S. at 287-88.

[124]    *See, e.g.*, *Kanuk*, 335 P.3d at 1101.

[125]    *Lowell*, 117 P.3d at 755 (quoting *Jefferson v. Asplund*, 485 P.2d 995, 997-98 (Alaska 1969)).

[126]    *Id.*; *see also Kanuk*, 335 P.3d at 1100-03.

[127]    *See Kanuk*, 335 P.3d at 1100-03.

[128]    *Id.* at 1102.

determine in the future whether the State has breached its duties as trustee."[129]  We concluded that declaratory relief would not have advanced "the goals of 'terminat[ing] and afford[ing] relief from the uncertainty, insecurity, and controversy giving rise to the proceeding' and would thus fail to serve the principal prudential goals of declaratory relief."[130]  Declaratory relief in this case thus should be granted only if it settled the legal relations between the parties more fully than it would have in *Kanuk.*

Plaintiffs argue that the prudential analysis in *Kanuk* does not apply in this case "given the distinct factual circumstances underlying the present case, including the . . . acceleration of climate change."  But our prudential analysis in *Kanuk* did not turn on climate change acceleration; it turned on our inability to "provide the plaintiffs any certain basis on which to determine in the future whether the State has breached its duties."[131]  Plaintiffs do not explain how this case's "distinct factual circumstances" make it more likely that declaratory relief would achieve this goal.  In truth a dynamic acceleration of climate change would reinforce the reality that the judiciary is the least competent branch to address climate challenges because we "lack . . . scientific, economic, and technological resources" and "may not commission scientific studies or convene groups of experts" essential to understanding evolving complexities.[132]

---

[129]    *Id.*

[130]    *Id.* (alterations in original) (quoting *Lowell*, 117 P.3d at 755).

[131]    *Id.*

[132]    *See id.* at 1099 (quoting *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 428 (2011)).

We see two relevant differences between this case and *Kanuk*. The *Kanuk* plaintiffs asserted a single right under the public trust doctrine;[133] in this case plaintiffs assert additional constitutional rights beyond the public trust doctrine. And the *Kanuk* plaintiffs alleged that the State had violated their rights through inaction;[134] in this case plaintiffs allege that the State has violated their rights through past actions implementing the State's energy policy. But neither distinction suggests that granting declaratory relief (absent injunctive relief) would settle the parties' legal relations more fully than it would have in *Kanuk*. Declaratory relief alone still would "have no immediate impact on [carbon] emissions," "would not compel the State to take any particular action," and would not "protect the plaintiffs from the injuries they allege."[135] It also would not tell the State how to fulfill its constitutional obligations or help plaintiffs determine when their constitutional rights have been violated.[136] Without judicially enforceable standards, which the political question doctrine prevents us from developing, declaring the existence or even violation of plaintiffs' various purported constitutional rights would not settle the parties' legal relations any more than it would have in *Kanuk*.

The dissent concedes that this is the correct result if *Kanuk* is followed.[137] But the dissent concludes that our *Kanuk* analysis no longer is sound.[138] The dissent agrees with plaintiffs that article VIII and its implied public trust doctrine create

---

[133]    *Id*.

[134]    *Id.* at 1090-91.

[135]    *See id*. at 1102 (explaining that declaratory relief would not settle parties' legal relations).

[136]    *See id*.

[137]    Dissent at 59.

[138]    *Id.* at 59-60.

individual fundamental constitutional "rights in the development, conservation, and use of our natural resources and environment."[139] And the dissent agrees with plaintiffs that article VIII grants each Alaskan an individual fundamental constitutional "right to a climate system that is healthy enough to 'sustain human life, liberty, and dignity.' "[140] Finally, the dissent agrees with plaintiffs that we should effectively enter declaratory judgment in their favor by holding that they have individual fundamental constitutional rights to Alaska's natural resources under article VIII, which includes a right to a stable climate system.[141]

The dissent describes this as "an admittedly small step in the daunting project of focusing governmental response to" climate change.[142] But the dissent says nothing about the next step it would take in this case. The plaintiffs' ultimate goal in having us recognize a new fundamental constitutional right — and requiring a State response to global climate change — can be realized only if plaintiffs are allowed to pursue a remedy for the claimed violations of their fundamental constitutional rights. Would the dissent remand for further proceedings to allow plaintiffs to seek their injunctive remedies? Or does the dissent continue to agree with *Kanuk*'s proposition that the political question doctrine prevents plaintiffs from seeking relief in this context? If the latter, what point is there in the dissent's proposed creation of unenforceable fundamental constitutional rights under article VIII?[143]

---

[139] *Id.* at 63, 65.

[140] *Id.* at 61.

[141] *Id.* at 61-62.

[142] *Id.* at 68.

[143] The New Mexico experience is instructive. In 1971, after a special election,
(continued...)

If the dissent envisions allowing plaintiffs to seek to establish violations of their constitutional rights, that would entirely disregard, and indeed effectively would overrule, our precedent about the judiciary's limited role in determining whether, in a challenge to agency action regarding natural resource development and environmental

---

[143] (...continued)
New Mexico added an explicit constitutional provision requiring its legislature to protect the environment. *See* Craig T. Othmer & Henry M. Rivera, *On Building Better Laws for New Mexico's Environment*, 4 N.M. L. REV. 105, 105 n.1 (1973).

> Article XX, section 21 of the New Mexico Constitution provides:

> The protection of the state's beautiful and healthful environment is hereby declared to be of fundamental importance to the public interest, health, safety and the general welfare. The legislature shall provide for control of pollution and control of despoilment of the air, water and other natural resources of this state, consistent with the use and development of these resources for the maximum benefit of the people.

> In *Sanders-Reed v. Martinez* the plaintiffs sought a judgment declaring that the public trust doctrine imposes a state duty to regulate greenhouse gas emissions in New Mexico. 350 P.3d 1221, 1222 (N.M. App. 2015). The New Mexico Court of Appeals agreed with the plaintiffs that New Mexico's constitutional provision "recognizes that a public trust duty exists for the protection of New Mexico's natural resources, including the atmosphere, for the benefit of the people of this state." *Id.* at 1225. But the court also noted that the constitutional provision "delegates the implementation of that specific duty to the Legislature." *Id.* at 1226. The court concluded that whatever common law power the judicial branch may have had under the public trust doctrine to "independently establish the best way to implement protections for the atmosphere, apart from its judicial review [of agency] actions" was superseded by the constitutional delegation to the legislature and the legislature's corresponding "statutory scheme." *Id.* The court further explained that issuing a decision that "independently ignores and supplants the [adjudicative] procedures established" by the legislature in its environmental laws would violate separation-of-powers principles. *Id.* at 1227.

protection, the agency has followed regulatory procedures and taken a "hard look" at all relevant considerations.[144] The judiciary's formerly limited role would change to case-by-case judicial determinations about the State's compelling interests in resource development, an individual's fundamental right to a particular atmospheric carbon level, and whether the State's proposed action is sufficiently tailored or tethered to the State's interests.[145] Judges would decide, as a matter of constitutional law, questions such as: what comprises a stable climate system; is a stable climate system measured by Alaskans uniquely susceptible to environmental harms or is there some arbitrary climate stability level for most, but not all, Alaskans; and should a court ultimately order that the State deny all permit applications for oil and gas drilling?

Declaratory judgment about the legislature's article VIII duties would do little more than restate the constitutional provisions while leaving the legislature to resolve how the State should fulfill those duties for the maximum benefit of Alaskans collectively.[146] And a declaratory judgment about putative individual fundamental constitutional rights to a stable climate system would provide no guidance to the

---

[144]     *Cf. supra* section II. C. (discussing limited judicial role in natural resource policies due to "hard look" doctrine of ensuring that legislature has considered all relevant factors when making natural resource decisions); *supra* note 143 (discussing New Mexico court's deferral to regulatory framework for constitutionally mandated legislative decision-making on resource development and environmental protection).

[145]     *See supra* note 48 (discussing various constitutional frameworks for resolving fundamental constitutional rights violation claims).

[146]     *See supra* note 143 (discussing New Mexico deferral to regulatory framework for constitutionally mandated legislative decision-making on resource development and environmental protection).

legislature about undertaking its article VIII duties.  We thus affirm the superior court's dismissal of plaintiffs' declaratory relief claims on prudential grounds.[147]

### c.     Plaintiffs' other argument about dismissal

Plaintiffs also argue that the superior court should not have dismissed their case because a "claim should not be dismissed as long as some relief might be available."[148]  But plaintiffs identify no viable relief, and we do not require courts to conduct trials based on the suggestion that some unidentified relief possibly could be available.  Plaintiffs ultimately face the same barrier the *Kanuk* plaintiffs faced:  Their claims for injunctive relief present non-justiciable political questions, and granting declaratory relief alone would not meaningfully settle the legal relations between the parties.[149]

## B.     Dismissal Of  Plaintiffs' Claims About The Denial Of The Rule-making Petition

### 1.     Standard of review

We apply the "reasonable and not arbitrary" standard to agency rule-making decisions about adopting regulations.[150]  For questions of law involving agency expertise, we apply the reasonable basis standard and "must confirm that the agency '. . . has genuinely engaged in reasoned decision making' and must verify that the agency has

---

[147]     Contrary to plaintiffs' contention, we do not believe the superior court "reached consideration of whether Alaska's Constitution protects" the right to a stable climate.  The court ultimately "dismissed on prudential grounds" plaintiffs' declaratory relief claims.

[148]     *Adkins v. Stansel*, 204 P.3d 1031, 1033 (Alaska 2009).

[149]     *See Kanuk ex rel. Kanuk v. State, Dep't of Nat. Res.*, 335 P.3d 1088, 1100-03 (Alaska 2014).

[150]     *Kelly v. Zamarello*, 486 P.2d 906, 911 (Alaska 1971).

not failed to consider an important factor in making its decision."[151] But questions of constitutional interpretation are reviewed de novo under the substitution of judgment standard.[152]

### 2. Analysis

Plaintiffs asserted that the Department's denial of their rule-making petition violated their constitutional rights. The superior court viewed this constitutional challenge as a claim that the denial was arbitrary, thus violating plaintiffs' right to due process in the agency proceedings. The court cited *Johns v. Commercial Fisheries Entry Commission*, in which we affirmed courts' "power . . . to look for administrative compliance with the demands of due process."[153] When exercising this power, courts consider whether the agency's decision was reasonable and not arbitrary and whether it complied with the applicable statutes.[154] A decision is arbitrary if "an agency fails to consider an important factor in making its decision";[155] an agency must take "a 'hard look' at the salient problems" and "genuinely engage[] in reasoned decision making."[156]

---

[151] *Alaska Ctr. for the Env't v. State*, 80 P.3d 231, 241 (Alaska 2003) (quoting *Trs. for Alaska v. State, Dep't of Nat. Res.*, 795 P.2d 805, 809 (Alaska 1990)).

[152] *Club SinRock, LLC v. Mun. of Anchorage, Off. of Mun. Clerk*, 445 P.3d 1031, 1033-34 (Alaska 2019) (quoting *Studley v. Alaska Pub. Offs. Comm'n*, 389 P.3d 18, 22-23 (Alaska 2017)).

[153] 699 P.2d 334, 339 (Alaska 1985).

[154] *See id.* at 339-40.

[155] *Se. Alaska Conservation Council, Inc. v. State*, 665 P.2d 544, 548-49 (Alaska 1983), *superseded on other grounds by statute*, ch. 86, SLA 2003.

[156] *Id.* (emphasis omitted) (quoting Harold Leventhal, *Environmental Decisionmaking and the Role of the Courts*, 122 U. PA. L. REV. 509, 511 (1974)).

The superior court found no constitutional violation because the Department "timely issued a four[-]page written decision that addressed each of [p]laintiffs' points" and explained its position "with supporting statutes, case law and well-reasoned analysis," and therefore the denial "satisfied the statutory due process requirements described in *Johns*." Notably, the Department's decision shows consideration of the "salient problem" central to plaintiffs' petition: impending climate disaster. The Department informed plaintiffs that responding to climate change was an administration priority; that the governor recently had appointed a "senior advisor for climate and directed her to work with state agencies, tribes and stakeholders on options that best meet Alaska's [climate-related] needs"; and that a petitioner group, Alaska Youth for Environmental Action, had "been invited to send a representative to [an upcoming] meeting . . . to discuss the path forward for Alaska." The Department "encourage[d] [plaintiffs] to continue to engage with the State's executive branch and to also reach out to the legislative branch, in seeking creative solutions to addressing climate change in Alaska." Because the Commissioner seriously considered the factors important to his decision — including its impact on the climate crisis — we agree with the superior court that the decision was not arbitrary and that it therefore satisfied due process.

As the State points out, we never have described our power to review an agency's denial of a proposed regulation as extending beyond the procedural due process review addressed in *Johns*.[157] Plaintiffs argue, however, that the denial of their rule-

---

[157] *See* 699 P.2d at 339 (noting that "[t]he absence of any mention of reviewability in AS 44.62.230 [the statute providing for rulemaking petitions] does not necessarily mean a court cannot pass on the validity of an act done pursuant to the provision" and holding that "[c]ourts have the power in situations such as this . . . to look for administrative compliance with the demands of due process").

making petition violated "substantive due process, equal protection, and public trust rights" and that the superior court erred by failing to evaluate the decision under the heightened standards applicable to these substantive constitutional rights. But plaintiffs cite no authority for the proposition that an agency's *denial* of a rule-making proposal — contrasted with issuing a regulation[158] or adjudicating a dispute[159] — can violate an individual's fundamental constitutional rights. And this argument assumes the Department's rule-making authority is much broader than it may be.

The Department discussed several justifications for denying the rule-making petition: that the proposed regulation, by setting "broad policy goals," failed to meet the definition of "regulation" established by Alaska Statutes and case law; that the proposed regulation "require[d] actions that are inconsistent with practical and fiscal constraints on the State and [the Department]"; that the proposed regulation went beyond the Department's statutory authority; that the proposed regulation conflicted with more

---

[158] *See, e.g.*, *State, Dep't of Fish & Game v. Manning*, 161 P.3d 1215, 1219-25 (Alaska 2007) (analyzing whether subsistence hunting regulations were unconstitutional); *Church v. State, Dep't of Revenue*, 973 P.2d 1125, 1130-32 (Alaska 1999) (holding PFD eligibility regulations were constitutional); *see also Hjelle v. Brooks*, 377 F. Supp. 430, 440-42 (D. Alaska 1974) (holding crabbing regulations were unconstitutional and enjoining enforcement of regulations).

[159] *See, e.g.*, *Club SinRock, LLC v. Mun. of Anchorage, Off. of Mun. Clerk*, 445 P.3d 1031, 1033, 1036-39 (Alaska 2019) (analyzing de novo free speech issue arising from agency adjudication); *see also McGrath v. Univ. of Alaska*, 813 P.2d 1370, 1373-74 (Alaska 1991) (explaining difference between rule making and adjudication and noting "agencies employ rule[-]making procedures to resolve broad policy questions affecting many parties and turning on issues of 'legislative fact' " (quoting *Indep. Bankers Ass'n of Ga. v. Bd. of Governors of Fed. Rsrv. Sys.*, 516 F.2d 1206, 1215 (D.C. Cir. 1975)); *Erickson v. Mun. of Anchorage*, 662 P.2d 963, 969 (Alaska App. 1983) (defining legislative facts as "those assumptions of fact, involving social, political, economic or scientific considerations, which a legislature . . . makes in the course of reaching the policy decisions which it articulates in the form of statutes and ordinances").

lenient federal standards and therefore, under Alaska law, would require support from peer-reviewed studies before it could be adopted; and that — given Alaska's modest contribution to global warming worldwide — the proposed regulation would not achieve the petitioners' goals even if implemented.

We find it sufficient to highlight one of these grounds: that the Department cannot use its rule-making authority to "contradict a clear legislative policy."[160] Regulations must be "consistent with and reasonably necessary to implement the statutes authorizing their adoption."[161] A regulation is invalid if it "conflicts with other statutes."[162]

The legislature's stated energy policy recognizes "concerns about global climate change" but at the same time "encourage[s] economic development by . . . promoting the development, transport, and efficient use of nonrenewable and alternative energy resources, including natural gas, coal, oil, gas hydrates, heavy oil, and nuclear energy, for use by Alaskans and for export."[163] The legislature's stated resource development policy refers to "purposeful development of the state's abundant natural resources" being "undertaken after consideration of the social and economic views of citizens impacted by the development, and only after adequate protection is assured for

---

[160]    *See Richardson v. Felix*, 856 F.2d 505, 511 (3d Cir. 1988) ("It is axiomatic that an administrative regulation or practice cannot validly contradict a clear legislative policy.").

[161]    *Manning v. State, Dep't of Fish & Game*, 355 P.3d 530, 534 (Alaska 2015) (quoting *Wilber v. State, Com. Fisheries Entry Comm'n*, 187 P.3d 460, 464 (Alaska 2008)).

[162]    *Id.* (quoting *Wilber*, 187 P.3d at 464-65).

[163]    AS 44.99.115.

Alaska's environment."[164]   And the legislature's stated Arctic policy emphasizes a commitment to economic development "consistent with the state's responsibility for a healthy environment," including existing and new "approaches for responding to a changing climate."[165]   The Department reasonably could conclude that the proposed regulation was inconsistent with the legislature's statutory policies and thus outside its delegated authority.  Because the decision to deny the rule-making petition therefore has "a reasonable basis in law,"[166] we affirm the superior court's rejection of plaintiffs' challenge to the Department's rule-making denial.

## V.    CONCLUSION

We AFFIRM the superior court's dismissal of plaintiffs' lawsuit.

---

[164]    AS 44.99.100(a).

[165]    AS 44.99.105(a)(1).

[166]    *Alaska Cmty. Action on Toxics v. Hartig*, 321 P.3d 360, 366 (Alaska 2014) (quoting *Storrs v. State Med. Bd.*, 664 P.2d 547, 554 (Alaska 1983)).

MAASSEN, Justice, with whom CARNEY, Justice, joins, dissenting in part.

I disagree with the court's rejection of declaratory relief as serving no useful purpose. In my view, a balanced consideration of prudential doctrines requires that we explicitly recognize a constitutional right to a livable climate — arguably the bare minimum when it comes to the inherent human rights to which the Alaska Constitution is dedicated.[1]

## A.    A Declaratory Judgment Is An Available Remedy.

This case was decided on a motion to dismiss. But " '[m]otions to dismiss are disfavored,' and before dismissal will be granted it must be 'beyond doubt that the plaintiff can prove no set of facts that would entitle him or her to relief.' "[2] "Even if the relief demanded is unavailable, the claim should not be dismissed as long as some relief might be available on the basis of the alleged facts."[3] The alleged facts in this case are, essentially, that rapidly accelerating climate change is causing serious damage on a spectrum ranging from the individual to the global, and that the State, while acknowledging the problem, continues to actively compound it. Given these alleged

---

[1]    *See* Alaska Const. art. I, § 1 ("This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry . . . .").

[2]    *Kanuk v. State, Dep't of Nat. Res.*, 335 P.3d 1088, 1092 (Alaska 2014) (alterations in original) (quoting *Adkins v. Stansel*, 204 P.3d 1031, 1033 (Alaska 2009)).

[3]    *Adkins*, 204 P.3d at 1033; *see also Jefferson v. Asplund*, 458 P.2d 995, 1000 (Alaska 1969) ("The test of the sufficiency of a complaint in a declaratory judgment proceeding is not whether the complaint shows that the plaintiff will succeed in getting a declaration of rights in accordance with his theory and contention but whether he is entitled to a declaration of rights at all." (citing *City of Mobile v. Gulf Dev. Co.*, 171 So. 2d 247, 257 (Ala. 1965))).

facts, a declaratory judgment about the nature of the rights at stake is a small but not inconsequential bit of relief.

Five of the plaintiffs' claims — paragraphs 3-7 of the amended complaint — seek declarations that their "fundamental and inalienable constitutional rights" have been violated by various actions of the State, both directly and through the State's energy policy. In order to determine whether the State's constitutional duties have been breached we must first determine whether a duty exists.[4] This question is raised by the amended complaint's first two requests for declaratory judgment, which ask the court to do the following:

> 1. Declare that Defendants have constitutional duties and constitutional and statutory authority to protect and refrain from infringing Plaintiffs' fundamental and inalienable constitutional rights to life, liberty, and property; equal rights, opportunities and protection under the law; and other unenumerated rights, including the rights to a stable climate system that sustains human life and liberty [and] dignity, to personal security and safety, autonomy, and other liberty interests, including their capacity to provide for their basic human needs, safely raise families, learn and practice their religious and spiritual beliefs, learn and transmit their native cultural traditions and practices, and lead lives with sufficient access to clean air, water, shelter, and food.

> 2. Declare that Defendants have constitutional duties and constitutional and statutory authority under the Public Trust Doctrine to maintain control over and protect Alaska's waters, atmosphere, land, fish, wildlife, and other Public

---

[4]   *Cf. Dore v. City of Fairbanks*, 31 P.3d 788, 791 (Alaska 2001) ("In order to reach the questions of whether the city has statutory immunity or has breached its duty, we must first determine whether the city owes a duty in tort to the plaintiff."); *Kooly v. State*, 958 P.2d 1106, 1108 (Alaska 1998) ("Determining whether a duty exists in the type of case presented is the first analytical step in deciding whether a negligence action can be maintained.").

Trust Resources from substantial impairment, waste, and alienation, and to manage such resources prudently and with impartiality and loyalty to present generations, including Youth Plaintiffs, and future generations.

The plaintiffs in *Kanuk* made similar requests. We described four of their claims for relief as "of the sort that is within the institutional competence of the judiciary" to decide:

> [A] declaratory judgment that (1) "the atmosphere is a public trust resource under [a]rticle VIII"; (2) the State therefore "has an affirmative fiduciary obligation to protect and preserve" it; (3) the State's duty is "enforceable by citizen beneficiaries of the public trust"; and (4) with regard to the atmosphere, the State "has failed to uphold its fiduciary obligation."[5]

We noted in *Kanuk* that "the plaintiffs do make a good case" for their declaratory judgment claim.[6] We explained that the public trust doctrine had its roots in "the sovereign's authority over management of fish, wildlife and water resources" and that it was now " 'constitutionalized' in Alaska's common use clause, article VIII, section 3," which reserves these resources "to the people for common use."[7] We observed that our earlier cases had "described the content of the trust, the State's duty as trustee, and the public's status as beneficiary — reflecting three of the plaintiffs' claims for declaratory relief in this case," and that the fourth claim, "[w]hether the State has breached a legal

---

**5**      *Kanuk*, 335 P.3d at 1099.

**6**      *Id.* at 1101-02.

**7**      *Id.* (quoting *Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 494 (Alaska 1988)).

duty," was also "a question we are well equipped to answer — assuming the extent of the State's duty can be judicially determined in the first place."[8]

But notwithstanding our institutional ability to decide these issues, we affirmed dismissal of the requests for declaratory relief in *Kanuk*, reasoning that declaring the plaintiffs' rights in the context of the public trust doctrine "would not significantly advance the goals of 'terminat[ing] and afford[ing] relief from the uncertainty, insecurity, and controversy giving rise to the proceeding' and would thus fail to serve the principal prudential goals of declaratory relief."[9] We further explained: "Within the very general framework of a public trust, 'the rights and obligations of [the] litigants' with regard to the atmosphere would depend on further developments — by the legislature, by executive branch agencies, and through litigation focused on more immediate controversies."[10]

The plaintiffs here contend that they have presented us with a "more immediate controvers[y]" based on their challenge to the codified State Energy Policy, AS 44.99.115(2)(B). The court decides that we should reach the same conclusion we did in *Kanuk* and again, prudentially, reject all the plaintiffs' claims for declaratory relief as unlikely to resolve anything. I agree with the court that this conclusion is consistent with *Kanuk*. A grant of declaratory relief here will not forestall future litigation over the same or similar issues. Litigation over the government's role in addressing climate change is still in its infancy, and more challenges to state action based on its potential for worsening the crisis are not just likely but certain, regardless of how we resolve this case.

---

[8] *Id.* at 1099-1100.

[9] *Id.* at 1102 (quoting *Lowell v. Hayes*, 117 P.3d 745, 755 (Alaska 2005)).

[10] *Id.* at 1103.

But I am no longer convinced that nothing can be gained by clarifying Alaskans' constitutional rights and the State's corresponding duties in the context of climate change. When considering the value of declaratory relief, the proliferation of climate-change litigation cuts both ways. On the one hand, as the court cogently explains today, it means that any decision we make here cannot "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding,"[11] the consideration we found most compelling in *Kanuk*. But because prudential concerns such as "practicality and wise judicial administration" also guide our use of declaratory relief,[12] we may conclude that it is an appropriate remedy even when terminating controversy is not possible.[13]

Undoubtedly, Alaskans who bring future challenges to state actions alleged to pose an unacceptable risk to the climate will continue to assert that a livable climate is a constitutional right. Appellate courts like ours have almost always avoided the issue on standing, justiciability, or prudential grounds; have decided that the constitution gives no such right; or have done both.[14] We decided in *Kanuk* that the plaintiffs had standing

---

[11] Op. at 44 (quoting *Lowell*, 117 P.3d at 755).

[12] *Kanuk*, 335 P.3d at 1101 (quoting *Lowell*, 117 P.3d at 756).

[13] As the court observes, prudential doctrines, by their very nature, allow for case-by-case determination rather than adherence to bright-line rules. Op. at 42 n.118.

[14] *See Juliana v. United States*, 947 F.3d 1159, 1164 (9th Cir. 2020) ("The central issue before us is whether, even assuming such a broad constitutional right [to a 'climate system capable of sustaining human life'] exists, an Article III court can provide the plaintiffs the redress they seek . . . . "); *Clean Air Council v. United States*, 362 F. Supp. 3d 237, 244-53 (E.D. Pa. 2019) (dismissing complaint for lack of Article III standing but also finding no constitutional basis for claims to "life-sustaining climate system").

to assert their claims and that their claims for declaratory relief were justiciable.[15]  But we have yet to say explicitly whether such claims have a basis in the Alaska Constitution.

This same important question is before us for the second time in six years. It has been thoroughly briefed by committed parties and three groups of amici.  Our failure to answer the question now will not eliminate it but will only postpone our answer, in the meantime putting the burden of redundantly litigating it on plaintiffs, the State, and the trial courts, potentially to return to us on appeal again and again until we conclude that prudence finally requires an answer.  Given the urgency of the issue, I would conclude that "practicality and wise judicial administration" militate strongly in favor of limited declaratory relief identifying the constitutional source of the right plaintiffs claim.[16]

## B.     The Public Trust Doctrine As "Constitutionalized" In Article VIII Provides A Right To A Livable Climate.

The plaintiffs' amended complaint asked for a declaratory judgment that the Alaska Constitution recognizes the right to a climate system that is healthy enough to "sustain human life, liberty, and dignity."  I agree that it does.  And I am not as stymied as the court is today by the inability to predict the course of future climate litigation.  As is true with every constitutional right, case law will continue to define the right further in the context of more specific controversies — including the extent to which it includes individuals' interests in "safely rais[ing] families, learn[ing] and

---

[15]     *Kanuk*, 335 P.3d at 1092-1100.

[16]     *See Chernaik v. Brown*, 475 P.3d 68, 84 (Or. 2020) (Walters, C.J., dissenting) (asserting that "the time is now" for court to "determine the law that governs the other two branches as they undertake their essential work" of addressing climate change and that "[t]his court can and should issue a declaration that the state has an affirmative fiduciary duty to act reasonably to prevent substantial impairment of public trust resources").

practic[ing] their religious and spiritual beliefs, learn[ing] and transmit[ting] their [N]ative cultural traditions and practices, and lead[ing] lives with sufficient access to clean air, water, shelter, and food," as the plaintiffs explain their claimed right in the amended complaint. Courts have grappled diligently with such unformed concepts as "fundamental rights,"[17] "substantive due process,"[18] and "right of privacy,"[19] clarifying rights and duties a case at a time. That we cannot answer every subsequent question does not mean we should shy away from answering the first.

The plaintiffs identify a number of possible sources for their claimed constitutional right to a healthy climate system. They contend that the State's energy policy, by causing and contributing to climate change, violates their substantive due process rights under article I, section 7; their equal protection rights under article I, section 1; and their "public trust rights" under article VIII.

The plaintiffs' substantive due process claims, though well reasoned, have minimal support in existing case law. They rely heavily on United States District Judge

---

[17] *See*, *e.g.*, *In re Tammy J.*, 270 P.3d 805, 813 (Alaska 2012) (identifying "personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education" as among the fundamental rights protected by substantive due process (quoting *Lawrence v. Texas*, 539 U.S. 558, 573-74 (2003))).

[18] *See*, *e.g.*, *id.*; *Doe v. Dep't of Pub. Safety*, 444 P.3d 116, 125 (Alaska 2019) ("Substantive due process is a doctrine that is meant to guard against unfair, irrational, or arbitrary state conduct that 'shock[s] the universal sense of justice.' " (alteration in original) (quoting *Church v. State, Dep't of Rev.*, 973 P.2d 1125, 1130 (Alaska 1999))).

[19] *See*, *e.g.*, *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965) (recognizing "the zone of privacy created by several fundamental constitutional guarantees"). In Alaska, of course, the constitutional right of privacy is explicit. Alaska Const. art. I, § 22.

Aiken's decision in *Juliana v. United States*[20] that public trust claims brought under federal law were enforceable as substantive due process claims under the Fifth Amendment's Due Process Clause[21] and the Ninth Amendment.[22]  The Ninth Circuit reversed the district court's decision on standing grounds while assuming the existence of the constitutional right;[23] District Judge Staton, sitting on the panel by designation and writing in dissent, located the constitutional right at issue not in substantive due process bur rather in the "perpetuity principle" that "is structural and implicit in our constitutional system":  that is, a principle "that the Constitution does not condone the Nation's willful destruction."[24]

These recent constitutional interpretations are novel and provocative.[25] But in Alaska there is a more obvious source of the right at issue in article VIII, which is devoted entirely to defining the people's rights in the development, conservation, and use of our natural resources and environment.

---

[20]    217 F. Supp. 3d 1224, 1260-61 (D. Or. 2016), *rev'd*, 947 F.3d 1159 (9th Cir. 2020).

[21]    "No person shall . . . be deprived of life, liberty, or property, without due process of law."

[22]    "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

[23]    *Juliana*, 947 F.3d at 1169-70.

[24]    *Id.* at 1175, 1177-79 (Staton, J., dissenting).

[25]    *See, e.g.*, Scott Novak, *The Role of Courts in Remedying Climate Chaos: Transcending Judicial Nihilism and Taking Survival Seriously*, 32 GEO. ENV. L. REV. 743 (2020); Bradford C. Monk, *Does the Evolving Concept of Due Process in* Obergefell *Justify Judicial Regulation of Greenhouse Gases and Climate Change?:* Juliana v. United States, 52 U.C. DAVIS L. REV. 855 (2018).

We addressed article VIII in *Kanuk* in the context of the public trust doctrine; the plaintiffs had asked us to declare that the atmosphere was a public trust resource the State had an affirmative duty to protect.[26] We did not find it necessary to answer that question. We observed that "if the plaintiffs are able to allege claims for affirmative relief in the future that are justiciable under the political question doctrine, they appear to have a basis on which to proceed even absent a declaration that the atmosphere is subject to the public trust doctrine."[27] Because the various aspects of our ecosystem are interdependent, "[a]llegations that the State has breached its duties with regard to the management of" individual resources "such as water, shorelines, wildlife, and fish" — which we have already recognized as subject to the public trust doctrine — "do not depend on a declaratory judgment about the atmosphere."[28] Simply put, the public trust doctrine is implicated by allegations that a particular State action exacerbates the climate crisis and thereby harms "water, shorelines, wildlife, and fish" — as the plaintiffs have alleged here.

By making those allegations, the plaintiffs plainly seek vindication of a constitutional right. Article VIII emphasizes the importance of resource development but also the importance of environmental stewardship. Article VIII, section 2, says that "[t]he legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, *for the maximum benefit of its people*." (Emphasis added.) Section 3 states the "common use" principle: "Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use." Section 4 articulates the "sustained yield" principle: "Fish,

---

[26]    *Kanuk v. State, Dep't of Nat. Res.*, 335 P.3d 1088, 1099 (Alaska 2014).

[27]    *Id.* at 1103.

[28]    *Id.*

forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses." Interpreting these provisions, we have observed that "[a]rticle VIII requires that natural resources be managed for the benefit of all people, under the assumption that both development and preservation may be necessary to provide for future generations, and that income generation is not the sole purpose of the trust relationship."[29] And as article VIII was described to the voters at the time of Statehood, its "primary purpose is to balance maximum use of natural resources with *their continued availability to future generations*. In keeping with that purpose, all replenishable resources are to be administered, insofar as practicable, on the sustained yield principle."[30] As we pointed out in *Kanuk*, the legislature has recognized these principles in declaring it "the policy of the state . . . to manage the basic resources of water, land, *and air* to the end that the state may fulfill *its responsibility as trustee of the environment for the present and future generations*."[31] Allegations that climate change destroys natural resources or even limits their continuing availability for present and

---

[29] *Brooks v. Wright*, 971 P.2d 1025, 1032 (Alaska 1999); *see also Owsichek v. State*, 763 P.2d 488, 495 (Alaska 1988) (noting that "the common use clause impose[s] upon the state a trust duty to manage the fish, wildlife and water resources of the state for the benefit of *all* the people" (emphasis added)).

[30] *Cook Inlet Fisherman's Fund v. State, Dep't of Fish & Game*, 357 P.3d 789, 803 (Alaska 2015) (emphasis in original) (quoting *West v. State, Bd. of Game*, 248 P.3d 689, 696 (Alaska 2010) (quoting THE ALASKA CONSTITUTIONAL CONVENTION, PROPOSED CONSTITUTION FOR THE STATE OF ALASKA: A REPORT TO THE PEOPLE OF ALASKA (1956))).

[31] 335 P.3d at 1102 n.78 (emphasis in original).

future generations clearly implicate the State's stewardship responsibilities under article VIII.[32]

The court today takes a very narrow view of both the rights granted by article VIII and our role in protecting those rights. The court is concerned that recognizing an individual right to a livable climate would impinge on the legislative prerogative to manage the State's natural resources for the benefit of all Alaskans.[33] But the Constitution recognizes individual Alaskans' rights vis-á-vis the State and their fellow citizens in a number of different contexts.[34] The judiciary acts within its delegated role when it concludes that the legislature, despite its broad article VIII powers, has

---

[32] *See Sanders-Reed v. Martinez*, 350 P.3d 1221, 1225 (N.M. 2015) (holding that state constitutional provision declaring importance of state's environment "recognizes that a public trust duty exists for the protection of New Mexico's natural resources, including the atmosphere, for the benefit of the people of this state").

[33] Op. at 36.

[34] *See* Alaska Const. art. VIII, § 11 (stating how mineral claimants discover and appropriate mineral rights); *id.* at § 14 (providing that access to navigable waters "shall not be denied to any citizen of the United States or resident of the State"); *id.* at § 16 (providing that "[n]o person shall be involuntarily divested of" rights in natural resources without just compensation and operation of law); *id.* at § 17 (providing that natural resource laws "apply equally to all persons similarly situated"); *id.* at § 18 (authorizing "[p]roceedings in eminent domain . . . for private ways of necessity"); *see also Owsichek*, 763 P.2d at 492 n.10 ("Since the right of common use is guaranteed expressly by the constitution, it must be viewed as a highly important interest *running to each person within the state*." (emphasis added) (quoting with approval *State v. Ostrosky*, 667 P.2d 1184, 1196 (Alaska 1983) (Rabinowitz, J., dissenting))).

violated individual Alaskans' article VIII rights.[35]  And as the court acknowledges,[36] we also act within our delegated role when we determine that an agency, despite having taken the requisite "hard look at the salient problems,"[37] has reached a decision that infringes a constitutional right.  We cannot exercise that oversight effectively without first defining the individual rights that may be implicated.

Recognizing a right to a livable climate does not mean that the right is violated whenever the legislature declares a resource development policy that harms the climate, or whenever an executive agency implements such a policy.  Even fundamental rights are not absolute but must be "balanced against conflicting rights and interests,"[38] which will often encompass policy judgments we are not equipped to make.  But Alaska's courts do have the experience and expertise required to weigh the effect of

---

[35]    *See McDowell v. State*, 785 P.2d 1, 4-11 (Alaska 1989) (striking down statute establishing rural preference for subsistence hunting and fishing as violating article VIII, §§ 3, 15, and 17).

[36]    Op. at 16-18.

[37]    *See Alpine Energy, LLC v. Matanuska Elec. Ass'n*, 369 P.3d 245, 251 (Alaska 2016); Op. at 17.

[38]    *Larson v. State, Dep't of Corr., Bd. of Parole*, 476 P.3d 293, 301 n.55 (Alaska 2020) (" 'The right to privacy is not absolute' but is balanced against conflicting rights and interests." (quoting *Jones v. Jennings*, 788 P.2d 732, 738 (Alaska 1990))); *Planned Parenthood of the Great Nw. v. State*, 375 P.3d 1122, 1163 n.52 (Stowers, J., dissenting) (Alaska 2016) ("Where a compelling state interest is shown, the right [to privacy] may be held to be subordinate to express constitutional powers such as the authorization of the legislature to promote and protect public health and provide for the general welfare." (quoting *Gray v. State*, 525 P.2d 524, 528 (Alaska 1974))); *Breese v. Smith*, 501 P.2d 159, 168-69 (Alaska 1972) (Although student's choice of hairstyle is protected by "a fundamental constitutional right implicit in the concept of liberty as guaranteed by the constitution of Alaska, we do not hold that such right is absolute. . . . [Personal freedoms] 'must yield when they intrude upon the freedom of others.' " (quoting *Bishop v. Colaw*, 450 F.2d 1069, 1075 (8th Cir. 1971))).

specific government action on individual rights.[39]  And defining those rights is part of our task.  As recently summarized by Chief Justice Walters of the Oregon Supreme Court: "How to address climate change is a daunting question with which the legislative and executive branches of our state government must grapple.  But that does not relieve our branch of its obligation to determine what the law requires."[40]

In my view, the law requires that the State, in pursuing its energy policy, recognize individual Alaskans' constitutional right to a livable climate.  A declaratory judgment to that effect would be an admittedly small step in the daunting project of focusing governmental response to this existential crisis.  But it is a step we can and should take.  For that reason I respectfully dissent.

---

[39]  *See, e.g.*, *Ellingson v. Lloyd*, 342 P.3d 825, 831 (Alaska 2014) (deciding that Board of Game failed to adequately consider facts and inconsistency with other laws when adopting regulation defining when domestic animal becomes "feral" for game purposes); *State, Bd. of Fisheries v. Grunert*, 139 P.3d 1226, 1240 (Alaska 2006) (striking down emergency regulation allocating harvestable salmon as inconsistent with Limited Entry Act); *Cook Inlet Keeper v. State, Off. of Mgmt. & Budget*, 46 P.3d 957, 965-66 (Alaska 2002) (holding that State's review of offshore exploratory drilling platform was deficient because it failed to consider discharges already permitted under federal law).

[40]  *Chernaik v. Brown*, 475 P.3d 68, 93 (Or. 2020) (Walters, C.J., dissenting).